**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ERIN BENTON,                                    :
                                                :
          Plaintiff,                            :          Civil Action No.:      14-1073 (RC)
                                                :
          v.                                    :          Re Document Nos.:   14, 15
                                                :
LABORERS' JOINT TRAINING FUND,                  :
                                                :
          Defendant.                            :

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Erica Benton ("Ms. Benton") alleges that her former employer, Defendant

Laborers' Training Fund ("the Fund"), failed to pay her more than $22,000 in overtime wages

between 2008 and 2012 in violation of the Federal Fair Labor Standards Act ("FLSA") and the

D.C. Minimum Wage Act ("DCMWA").  She also alleges that the Fund violated the FLSA by

retaliating against her for complaining about unpaid overtime, ultimately terminating her on May

16, 2014.

Now before the Court are the parties' cross-motions for summary judgment.  Ms. Benton

seeks partial summary judgment as to a subset of unpaid overtime hours that she worked

between June 25, 2011, and December 31, 2012.  She asserts that she is owed $6,194.34 in

unpaid wages for that time period, and she requests an equal amount in liquidated damages under

the FLSA and DCMWA.  The Fund has moved for summary judgment as to all claims, arguing

first that the unpaid overtime claims fail as a matter of law because the overtime provisions of

the FLSA do not apply to the Fund, which is a non-profit organization, or to Ms. Benton, who worked in an administrative position. The Fund also maintains that Ms. Benton has failed to establish a *prima facie* case of retaliation, and that she was terminated for legitimate, non-retaliatory reasons. Upon consideration of the parties' motions, the memoranda in support thereof and opposition thereto, and the summary judgment record, the Court will deny Ms. Benton's motion for partial summary judgment as to her FLSA overtime claim, grant the Fund's cross-motion for summary judgment as to the FLSA overtime and retaliation claims, and dismiss without prejudice the DCMWA overtime claim.

## II. FACTUAL BACKGROUND

The Fund is a non-profit 501(c)(5) organization "designed to provide labor training to members of two labor unions in the District of Columbia: Laborers' International Union of North America ('LIUNA') Local 657 and Local 11." Def.'s Statement of Material Facts Not in Dispute ¶¶ 1, 4, ECF No. 15-2 ("Def.'s SOF"). The training is limited to laborers' classification construction work, Guerrero Dep. 45:5–8, Dec. 8, 2014, ECF No. 15-5, and "the purpose of the Training Fund is to provide unique training to construction laborers who are members of LIUNA to help them qualify for work and to get better work." *See* Benton Dep. 18:13–17, Dec. 3, 2014, ECF No. 14-4. The organization is a third-party recipient of contributions made pursuant to collective bargaining agreements, and additional funding comes from federal, local, and union grants. Def.'s SOF at ¶¶ 5, 6; Meighan Dep. 6:14–16, Dec. 8, 2014, ECF No. 14-3.

Ms. Benton was a full-time, salaried employee of the Fund from January 1, 2003, until her termination on May 16, 2014. Pl.'s Resp. to Def.'s Interrog. No. 7, ECF No. 14-5. The parties dispute whether Ms. Benton had an official job title, but she was at times called an

"Administrative Assistant," Def.'s Ex. 12 at 6, ECF No. 15-14, and at other times referred to as the "Office Manager," Def.'s Ex. 13 at 2, ECF No. 15-15, or "Assistant to Director," Def.'s Ex. 15 at 2, ECF No. 15-17. When she was first hired, Ms. Benton's responsibilities included clerical duties, filing reports, implementing a database, assisting the director of the Fund, supporting the Fund's instructors, and providing customer service to the Fund's members. Benton Dep. 22:7–11. By 2006, Ms. Benton had gained experience at the Fund and the director had been replaced by an individual who was less familiar with the role, so Ms. Benton took on a greater role in assisting the director, communicating with the Fund's third-party administrator about the Fund's bills, and obtaining grants for the Fund. *Id.* at 26:2–36:12; 52:13–56:18. Among other things, Ms. Benton also reconciled the petty cash book, processed checks for stipends, ordered office supplies and meals for trainings, assisted in creating the Fund's training schedules, solicited bids for service providers and rental equipment, signed a $35,220 lease for a copier, and kept the office running while the director was out. *Id.* at 41:16–48:8; 58:18–59:13; 127:17–128:8; 137:19–143:13.

On a number of occasions, Ms. Benton worked during Saturday training sessions put on by the Fund. *See* Progress Report, Def.'s Ex. 30, ECF No. 15-32. At the trainings, she processed classes and issued certificates and state licenses to attendees. Benton Dep. 267:13–15. She estimates that as a result, she worked 595.5 hours of overtime from 2008 through 2012. Pl.'s Suppl. Resp. to Interrog. No. 15, ECF No. 14-12. Her annual salary during that time ranged from $50,404 to $54,290, and she was not paid time-and-half for hours worked on Saturdays, regardless of whether it caused her to work over forty hours in a given week. *Id.*

On December 31, 2012, the Fund terminated its relationship with the third-party administrator that had previously handled tasks like administering payroll, benefits, and cutting

checks for vendors.  Meighan Dep. 30:17–31:17.  The decision to administer the Fund internally was made in an effort to reduce the organization's expenses.  Benton Dep. at 62:2–63:12.  As a result, Mary McNelis began handling the work related to administering the Fund as of January 1, 2013.  *Id.* at 62:2–63:12; 227:5–10.  Ms. McNelis "essentially took over a lot of [Ms. Benton's] responsibilities."  Benton Dep. 227:5–18; *see also* McNelis Decl. ¶ 5, ECF No. 15-13.

On April 26, 2013, Justin Meighan, the chairman of the Fund's Board of Trustees, sent a list of "action items" to Fund director Lou DeGraff requiring, among other things, confirmation that Ms. Benton would work only out of the Fund's Local 657 Office in DC during regular work hours and ordering that her work cell phone be cancelled, as she would not need the phone when working at a single site.  Meighan e-mail, Def.'s Ex. 16, ECF No. 15-18.  Those changes were implemented the following month.  Benton Dep. at 260:5–261:9, 267:13–269:19.

In May 2013, some of the Fund's instructors learned that other training funds were being audited in relation to Saturday training session hours worked by instructors.  Benton Dep. 81:17–21; 83:4–13.  Ms. Benton and the instructors mentioned to Mr. DeGraff what they had heard about the other funds.  *Id.* at 84:2–88:13.  Mr. DeGraff told them to "start looking for [their] original employment letters because if there was an issue, he was going to look into it and see what he could do to get [them] compensated."  *Id.* at 85:10–13.  The Fund subsequently investigated the overtime hours worked by employees in 2013, terminated Mr. DeGraff, and implemented a new employee handbook in July 2013 that required all overtime to be approved in writing in advance, but it did not investigate any overtime hours worked prior to 2013.  *Id.* at 217:6–218:14.

During a general staff meeting in June or July 2013, the Fund announced that Mr. DeGraff was no longer employed as the Fund's director and that there were going to be changes.

4

*See* Benton Dep. 97:7–16.  When someone brought up Saturdays during the staff meeting, Mr. Meighan "abruptly ended the meeting."  *Id.* at 86:16–87:17; 97:7–98:2.  Ms. Benton recalls that when she saw Mr. Meighan after the summer staff meeting, he greeted others but "barely acknowledged" her, *id.* 87:11–17, and she believes that the work "atmosphere changed" at the Fund "in the way that things were done more by the book," *id.* at 86:5–7, 91:21–92:10.

As a consequence, Ms. Benton felt as if the Fund employees were "being treated as if they had done something wrong" simply because they had brought the potential overtime issue to the attention of the director.  Benton Dep. 84:2–7.  She believed management wanted to "take a closer look at what was going on," and there was more "micromanaging" in the office.  *Id.* at 272:12–20.  Making matters worse, the new director Jim Anastase was "a screamer and a yeller," and she found him "somewhat hard to deal with."  *Id.* at 239:12–240:3.  She complained to Anthony Frederick, who sat on the Fund's Board of Trustees, about the way that she and the instructors were treated by Mr. Anastase, and when she told Mr. Anastase that she expected to be treated with respect, he told her he would not change and she needed thicker skin.  *Id.* at 241:11–24310.  When Ms. Benton became ill and took sick leave between late December 2013 and mid-March 2014, she began to look for other employment "[b]ecause the environment was very hard to deal with . . . [b]ecause of the director . . . Jim Anastase."  *Id.* at 238:10–239:5; 244:11–22.  Ms. Benton "became discouraged when no one would basically hear what [she] had to say in regards to some complaints that [she] had with the treatment that [she] was receiving," and there was some "confusion as well regarding [her] performance" at work.  *Id.* at 245:21–246:15.

On May 12, 2014, Ms. Benton went to the Employment Justice Center ("EJC") in the District of Columbia to discuss her overtime concerns.  Benton Dep. 284:13–285:4.  But when she got to EJC, she filled out an intake form and spoke to a volunteer who told her that EJC had a

conflict of interest and could not help her.  *Id.*  She never made a claim regarding unpaid overtime with any agency.  *Id.* at 240:19–21.

Ms. Benton was terminated on May 16, 2014.  The Fund maintains that Ms. Benton was fired for performance issues, poor attitude, and failure to comply with Fund policies and procedures.  Def.'s SOF ¶ 90; Meighan Dep. at 87:5–8.  Ms. McNelis recalls that Ms. Benton seemed upset when she took over some of her prior administrative duties, that Ms. Benton was hostile under Mr. Anastase's leadership, and that she was argumentative about the Fund's new policies, McNelis Decl. ¶ 6, ECF No. 15-13, although Ms. Benton disputes these assertions.  Ms. McNelis also recalls having to ask Ms. Benton repeatedly to stop using her personal e-mail to conduct Fund business and to provide account information and passwords for the Fund's service providers.  *Id.* ¶¶ 8–9.  According to Ms. McNelis, Ms. Benton incorrectly input information so that the January 2014 reports for the Board of Trustees were incorrect, and in the months prior to her termination, she failed to maintain the petty cash in an organized and timely fashion.  *Id.* ¶¶ 9–11.  Ms. Benton also worked unauthorized overtime on two occasions despite having been instructed not to do so, and she was formally reprimanded for the second offense.  Def.'s Ex. 18, ECF No. 15-20; Def.'s Ex. 19, ECF No. 15-21.

Ms. Benton initiated this action on June 25, 2014, alleging that she is entitled to unpaid overtime wages for hours worked between February 9, 2008 and April 13, 2013.  Compl. ¶¶ 12, 40, ECF No. 1.  Counts I and II of her complaint allege violations of the overtime provisions of the FLSA and the DCMWA, respectively.  *Id.* ¶¶ 36–48.  Count III of Ms. Benton's complaint alleges that after she and the instructors inquired about unpaid overtime in June 2013, she was unlawfully terminated on May 16, 2014, "in retaliation for complaining and asserting her rights to unpaid overtime wages under the FLSA."  *Id.* ¶¶ 18–24, 49–56.

### III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (citation omitted).  Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position – "there must be evidence on which the jury could reasonably find for [the nonmoving party]."  *Anderson*, 477 U.S. at 252.  Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for

trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

When both parties file cross-motions for summary judgment, "each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006); *Nuzzo v. FBI*, No. 95–CV–1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996) ("When both parties in a cause of action move for summary judgment, each party must carry its own burden."). Finally, the Court notes that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (citation omitted).

## IV.  ANALYSIS

### A.  FLSA Overtime Claim

Ms. Benton's first claim is that the Fund failed to pay her time-and-half for overtime hours worked during Saturday training sessions in violation of the FLSA.  Compl. ¶¶ 36–42.  She seeks partial summary judgment as to unpaid overtime wages for hours worked between June 25, 2011 and December 31, 2012.[1]  Pl.'s Mem. Supp. Mot. Summ. J. at 2, ECF No. 14-2.  The Fund, on the other hand, maintains that it is entitled to summary judgment as to the entirety of Ms.

---

[1] Ms. Benton's motion does not seek summary judgment as to overtime hours worked prior to June 25, 2011, which would require a finding that the statute of limitations had been tolled.  *See* Pl.'s Mot. Summ. J. at 1 n.1, ECF No. 14; Pl.'s Mem. Supp. Mot. Summ. J. at 2.–4.

Benton's FLSA claim because she has not shown that the Fund is an "enterprise engaged in commerce" subject to coverage under the FLSA's overtime provision.  Def.'s Mot. Summ. J. at 20–23, ECF No. 15–1.[2]  The Court's analysis of Ms. Benton's FLSA overtime claim begins— and ends—with the threshold question of whether the Fund constitutes an "enterprise" covered by the FLSA.

"Under the FLSA an employee is ordinarily entitled to pay equal to one and one-half times his normal hourly wage for all hours worked beyond forty per week."  *Smith v. Gov't Employees Ins. Co.*, 590 F.3d 886, 892 (D.C. Cir. 2010) (citing 29 U.S.C. § 207(a)(1)).  While courts construe the FLSA "liberally to apply to the furthest reaches consistent with congressional direction," *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (internal quotation marks omitted), the reach of the FLSA's overtime provision is expressly limited to those "employees who in any workweek [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).  Accordingly, before an employee can recover overtime wages under the Act, she must first establish that her employment relationship is subject to coverage under the FLSA.[3]  *See D.A. Schulte, Inc., v. Gangi*, 328 U.S.

_____

[2] Alternatively, the Fund maintains that Ms. Benton was exempt from the overtime requirement during the time in question because she was employed in a "*bona fide* administrative capacity."  *Id.* at 21–32.  But because the Court finds that Ms. Benton has failed to establish that the Fund is subject to FLSA coverage, it will not address this alternative argument.

[3] If a plaintiff establishes coverage, the burden then shifts to the employer to show that the employee falls within one of the exemptions to the FLSA's overtime requirements.  *Briggs v. Chesapeake Volunteers in Youth Services, Inc.*, 68 F. Supp. 2d 711, 714 (E.D.Va. 1999) ("Employees seeking compensation based on the FLSA have the burden of proving that the FLSA applies to their employer/employee relationship . . . .  Once this initial burden is met, the burden shifts to the employer to establish whether one of the specific exemptions under the FLSA applies."); *see also Smith v. Govt. Employees Ins. Co.*, 590 F.3d 886, 891 (D.C. Cir. 2010)

108, 120 (1946) (discussing plaintiff's burden of establishing individual FLSA coverage); *Malloy v. Assoc. of State and Territorial Solid Waste Mgmt. Officials*, 955 F. Supp. 2d 50, 54 (D.D.C. 2013) (holding that "enterprise coverage [is] a substantive ingredient of the plaintiff's [FLSA] claim"); *Benitez v. F & V Car Wash, Inc.*, No. 11–CV–1857, 2012 WL 1414879, at *1 (E.D.N.Y. Apr. 24, 2012) (holding that establishing enterprise coverage under the FLSA is an "element that a plaintiff must establish in order to prove liability") (collecting cases).

FLSA coverage comes in two forms: "enterprise" and "individual."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.10 (1985).  An employee with "enterprise" coverage works for an employer that is both "an enterprise" and "engaged in commerce or in the production of goods for commerce."[4]  *See* 29 U.S.C. § 207(a)(1); *see also Malloy*, 955 F. Supp. 2d at 55 (explaining that to establish enterprise coverage, an employee must first show that the employer is an "enterprise," and then show that the enterprise is "engaged in commerce").  Alternatively, an employee is covered individually under the FLSA if she personally is "engaged in commerce or in the production of goods for commerce."  *Id.*  Although a given employee may have coverage under either or both theories, Ms. Benton's complaint alleges only enterprise

---

(holding that employer bears the burden of establishing that employee falls within administrative exemption to the FLSA).

[4] To be "engaged in commerce or in the production of goods for commerce," an enterprise must have two or more employees "engaged in commerce or in the production of goods for commerce . . . or . . . handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and the enterprise must also have an annual gross volume of sales or business of not less than $500,000.  29 U.S.C. § 203(s)(1)(A).  Alternatively, an enterprise will be deemed to have engaged in commerce if it is engaged in operating a type of institution listed in 29 U.S.C. § 203(s)(1)(B), or if it is an "activity of a public agency," *id.* § 203(s)(1)(C), but Ms. Benton does not contend that either of these alternative means of establishing enterprise coverage are implicated in this case.

coverage, not individual coverage.  *See generally* Compl. (alleging that the Fund "was engaged in commerce or in the production of goods for commerce within the meaning of [29 U.S.C. § 203(s)(1)]," that its "gross revenue exceeded $500,000.00, and thus Defendant qualified as an 'enterprise' within the meaning of § 3(r) of the FLSA").  The Court thus proceeds by considering whether the summary judgment record, viewed in the light most favorable to Ms. Benton, permits a finding that the Fund is an "enterprise" covered by the FLSA.

## 1.  Enterprise Coverage

The FLSA defines an "enterprise" in pertinent part as "the related activities performed (either through unified operation or common control) by any person or persons *for a common business purpose*."  29 U.S.C. § 203(r)(1) (emphasis added).  Non-profit charitable, religious, or educational organizations are not automatically exempt from the FLSA, however, and they will be viewed as satisfying the "business purpose" requirement to the extent that the organizations "engage in ordinary commercial activities, such as operating a printing and publishing plant."  29 CFR § 779.214.  The operative question in such cases is whether the organization's activities "serve the general public in competition with ordinary commercial enterprises."  *Alamo*, 471 U.S. at 299.

In *Alamo Foundation*, for example, the Supreme Court held that where a nonprofit religious organization operated and derived its income from a number of ordinary commercial businesses, including "service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy," and where those businesses engaged in competition with other commercial businesses, they were being conducted for a "business purpose."  471

11

U.S. at 292–306.[5]  On the other hand, where a non-profit trade organization provided lobbying

services and hosted conferences only for its members, this Court held that because the

organization provided no "services to the general public for which it competes with other

commercial enterprises," it did not act for a common business purpose or constitute an

"enterprise" covered by the FLSA.  *Malloy v. Ass'n of State & Territorial Solid Waste Mgmt.*

*Officials*, 955 F. Supp. 2d 50, 55-56 (D.D.C. 2013) (dismissing FLSA claim against non-profit

trade association that provided lobbying-like services and hosted conferences only for state and

territorial waste management officials because plaintiff failed to allege that the association

provided "services to the general public for which it competes with other commercial

enterprises").[6]

---

[5] The Supreme Court affirmed the Eighth Circuit's decision, which had reasoned that "[b]y entering the economic arena and trafficking in the marketplace, the [organization] has subjected itself to the standards Congress has prescribed for the benefit of employees."  *Id.* at 294–95 (quoting 722 F.2d 397, 400 (1984)).

[6] *See also Reagor v. Okmulgee County Family Resource Center*, 501 Fed. Appx. 805 (10th Cir. 2012) (affirming dismissal of FLSA claim for lack of coverage where plaintiff failed to allege that non-profit organization that provided shelter to domestic violence victims "was engaged in a business purpose or in any type of competition"); *Briggs v. Chesapeake Volunteers in Youth Services, Inc.*, 68 F. Supp. 2d 711, 714–15 (E.D.Va. 1999) (holding that non-profit corporation that provided services to juveniles was not an enterprise subject to FLSA in the absence of evidence that it "in any way competes with other commercial ventures, or charges its clients for services"); *Archie v. Grand Cent. Partnership, Inc.*, 997 F. Supp. 504, 527–28 (S.D.N.Y. 1998) (holding that non-profit organizations that operated "pathways to employment" program for the homeless qualified as an "enterprise" because they "shared a common business purpose—providing service at a fee to improve business operation conditions," and "regularly entered into contracts and solicited business from private corporations promising that it would supply formerly homeless persons to act in a security capacity"); *Reich v. Shiloh True Light Church of Christ,* 895 F. Supp. 799, 818 (W.D.N.C. 1995) (holding that "vocational training program" for children that billed customers for the labor provided and that competed with other contractors had become a commercial enterprise subject to the FLSA); *Wagner v. Salvation Army*, 660 F. Supp. 466 (E.D. Tenn. 1986) (granting summary judgment to employer where plaintiff failed to show that the transient lodge operated by Salvation Army exclusively for

In this case, it is undisputed that the Fund is a non-profit "training fund designed to provide training to members of Laborers' International Union of North America Local 657 and Local 11." Pl.'s Mem. Support. Mot. Summ. J. at 2, ECF No. 14-2 (quoting Meighan Dep. at 5:14–21). It does so "to help [construction laborers who are union members] qualify for work and to get better work." Benton Dep. 18:13–18. In its Statement of Material Facts not in Genuine Dispute, the Fund further asserted that it "engages in 'unique' work providing training for solely laborers' classification construction work . . . [and] does not compete in the commercial marketplace." Def.'s SOF ¶¶ 1,13. Rather than contesting this assertion, Ms. Benton conceded that the statement was either "accurate" or "not material" and declined to respond to it, *see* Pl.'s Opp'n at 1–2, ECF No. 16, thereby admitting that the Fund provides training only to certain union members and that it does not compete with commercial businesses. *See Trawick v. Hantman*, 151 F. Supp. 2d 54, 59 (D.D.C. 2001) ("[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." (quoting LCvR 7.1(h))).

After conceding the point, however, Ms. Benton alleged for the first time in her reply brief in support of her motion for summary judgment that while the Fund's training activities are limited to union members, it publishes a list of available courses on its website and "[m]any other organizations and schools provide and charge for similar training courses" in the area, so "the Fund is engaged in competition with ordinary enterprises, and is therefore an enterprise in itself." Pl.'s Reply at 4, ECF No. 20. In support of this belated change in position, Ms. Benton

---

transients was an "enterprise" because it did not "serve the general public [or] . . . compete with other private entrepreneurs").

offers only a footnote with links to three websites, providing no citation to any evidence in the summary judgment record.  *See id.* at 4 n.2.  She also does not explain in what respects the training courses are "similar," allege that the Fund charges members for the courses it offers, or provide any further facts supporting her conclusion that the Fund is engaged in competition with ordinary commercial enterprises.  Ms. Benton has offered too little too late.

First, "it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief."  *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011) (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n. 5 (D.D.C. 2008)); *see also McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief ... is not only unfair . . . , but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)); *Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013) (party forfeits argument made for the first time in its reply brief); *Baloch v. Norton*, 517 F. Supp. 2d 345, 348 n. 2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply.").  Declining to consider arguments made for the first time in a reply brief is particularly appropriate where, as here, the "new argument on Reply is inconsistent with [the party's earlier] admission," and it is unsupported by affidavit, declaration, or other competent evidence.  *Kempthorne*, 537 F. Supp. 2d at 12 n.5.

Second, even if the Court were inclined to entertain Ms. Benton's new argument, it would nevertheless fail for lack of evidentiary support.  Because the Fund has pointed to deposition testimony to establish that it is a non-profit organization offering specific types of

14

training only to its members and that it does not compete in the commercial marketplace, *see, e.g.*, Meighan Dep. 5:16–8:2, Mejia Dep. 78:17–79:19; Guerrero Dep. 44:2–45:8, Ms. Benton was obligated to "to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (holding that at summary judgment, nonmovant must not rely on pleadings and must point to "sufficient evidence supporting the claimed factual dispute"). Her conclusory assertion that the Fund is engaged in competition with ordinary commercial enterprises, contained only in a reply brief and unsupported by facts in the summary judgment record, is simply insufficient to satisfy Ms. Benton's obligations under Federal Rule of Procedure 56. *See* Fed. R. Civ. P. 56(c) (requiring a party seeking to obtain or avoid summary judgment to support her factual assertion by "citing to particular parts of materials in the record").

Third, even if the Court credited Ms. Benton's assertion that trade schools and other entities charge the public for training services similar to those that the Fund provides to its members, that fact alone would not suffice to establish that the Fund is an enterprise subject to the FLSA. Although transportation services, cellular telephone services, food, lodging, and clothing are all made publically available for purchase by commercial businesses, where those same goods and services are provided by a non-profit organization free of charge and not made available to the general public, courts have consistently found that the non-profit organization is not engaging in commercial competition or subject to enterprise coverage under the FLSA. *See, e.g., Ray*, 2011 WL 5865952, at **3–5 (holding that where non-profit provided transportation services only to "low-income, senior, and disabled individuals," it was not an "enterprise

engaged in commerce"); *Wagner*, 660 F. Supp. 466 at 467–68 (holding that Salvation Army's transient lodge—which provided food, clothing, and housing free of charge to transient individuals—was not competing with private entrepreneurs or subject to FLSA "enterprise" coverage); *Reagor*, 501 Fed. App'x at 810–11 (finding that domestic violence shelter employee who helped victims "obtain cellular telephone service or upgrade existing service" did so in furtherance of the non-profit's charitable purposes and "not as a competitor in the cellular telephone business," and holding that non-profit was not subject to enterprise coverage because it did not operate for a business purpose). Thus, the fact that some commercial business sell similar training services to the public, standing alone, does not transform the Fund's provision of those services exclusively to union members into evidence that the non-profit "serves the general public in competition with ordinary commercial enterprises." *See Alamo*, 471 U.S. at 299.

Accordingly, because Ms. Benton concedes that the Fund's services were available only to certain union members and not to the general public, and because she has failed to produce any competent evidence suggesting that the Fund competes with ordinary commercial businesses, the Court finds that Ms. Benton has failed to establish that the Fund is an "enterprise" subject to the FLSA. *See Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) (holding that "the failure of the plaintiff to demonstrate an issue for trial involving employee coverage, based on either the enterprise or individual theory, is a proper basis for dismissing his FLSA claim on summary judgment"). The Fund is therefore entitled to summary judgment as a matter of law on Ms. Benton's FLSA overtime claim premised on the assertion of enterprise coverage.

### 2. Individual Coverage

As previously discussed, Ms. Benton's complaint alleges only that the Fund is an enterprise covered by the FLSA, not that she is covered as an individual employee. Her motion for summary judgment is similarly devoid of any assertion of individual coverage. In her reply brief in support of her motion for summary judgment, however, Ms. Benton argues for the first time that she is also subject to individual coverage under the FLSA because she "regularly crossed state lines, as often as four times per week, in the course of her employment." Pl.'s Reply at 2 (citing Benton Dep. at 114:8–12; 116:7–11; 267:11–17). As the Fund rightly pointed out in its opposition to Ms. Benton's motion for summary judgment, however, no such individual coverage claim or allegation of weekly interstate travel is set forth in Ms. Benton's complaint. Def.'s Opp'n at 2 n.1, ECF No. 17 (arguing that Ms. Benton's claims must be evaluated exclusively under the enterprise theory of coverage asserted in her complaint).

Ms. Benton's eleventh-hour introduction of a new claim of coverage is clearly impermissible. As discussed above, "courts generally will not entertain new arguments first raised in a reply brief," Lewis, 791 F. Supp. 2d at 139 n.4, particularly when the party in question has already had multiple opportunities to brief her arguments comprehensively.[7] Kempthorne, 537 F. Supp. 2d at 12 n.5. See also Crest Hill Land Dev., L.L.C. v. City of Joliet, 396 F.3d 801, 804 (7th Cir. 2005) ("'Surprises' such as new arguments or defense theories propagated after the completion of discovery and filing of summary judgment are wisely discouraged."); Baloch v.

---

[7] The Court notes that Ms. Benton failed to present her individual coverage claim in either her motion for summary judgment or in her opposition to the Fund's cross-motion for summary judgment, and she has offered no explanation for her failure to raise the issue prior to her reply.

*Norton*, 517 F. Supp. 2d 345, 349 n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court [may] . . . ignore those arguments in resolving the motion").  And a plaintiff wishing to amend a complaint must do so in compliance with Federal Rule of Civil Procedure 15; amendment via the introduction of new claims in a reply brief is not permitted.  *See Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 107 (D.D.C. 2004) (stating that plaintiffs' attempt to amend their complaint through their pleading was "clearly impermissible" under Federal Rule of Civil Procedure 15); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempts to broaden claims and thereby amend its complaint in opposition to defendant's motion for summary judgment).

    The Court therefore will not consider Ms. Benton's belated claim of individual coverage at this time.  *See Robinson v. CAS 4000 Kansas LLC*, 5 F. Supp. 3d 108, 114 (D.D.C. 2013) (declining to consider an individual coverage claim where plaintiff's complaint included allegations about the employer's gross income and made "specific references to the parts of the statute pertaining to enterprise coverage," so that "the most plausible reading of the amended complaint is that Plaintiff proceeds on an enterprise theory"); *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 320 (D.D.C. 2012) ("declin[ing] to entertain the plaintiff's attempt to essentially re-fashion his complaint" where his complaint alleged that defendants' liability was derived from their status as publishers, but his opposition brief argued for the first time that liability arose also from the violation of contractual and fiduciary obligations).[8]

---

[8] Even if this Court were inclined to consider Ms. Benton's assertion of individual coverage, such a claim requires evidence that the employee in question "regularly engaged in traveling across State lines in the performance of their duties (as distinguished from merely going to and from their homes or lodgings in commuting to a work place)," and "an employee who, in isolated or sporadic instances, happens to cross a State line in the course of his employment, which is otherwise intrastate in character," would not qualify.  29 C.F.R. § 776.12.

Nevertheless, in light of Ms. Benton's deposition testimony that for at least some period of time, she travelled to Virginia for work multiple times a week, Benton Dep. at 116:5–11, and because as a general matter, "when a party has a valid claim, [s]he should recover on it regardless of [her] counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits," *Wiley v. Glassman*, 511 F.3d 151, 159 (D.C. Cir. 2007), the Court will permit Ms. Benton to seek leave to amend her complaint to include a claim of individual coverage based on interstate travel within 14 days from the issuance of this decision.

## B. FLSA Retaliation Claim

The Fund next seeks summary judgment as to Ms. Benton's claim of retaliation in violation of the FLSA.[9]  Ms. Benton's complaint alleged that she worked her last Saturday training session on April 13, 2013, and that in "early May 2013" she was told "she was no longer needed in the Virginia office and her company cell phone was taken away."  Compl. ¶¶ 21, 53. She further alleged that in June 2013,[10] she and the Fund's instructors brought to the attention of the Fund's director the fact that another labor organization was being audited in relation to its

---

It is not clear from the deposition testimony to which Ms. Benton now points whether she was required to travel from the Fund's office in the District to the office in Virginia, or if she merely travelled from her home to the Fund's site in Virginia.  *See* Benton Dep. at 114:8–12, 116:7–1, 267:11-17.  Nor is it clear if she had to make such trips regularly throughout the years in question, or if she did so only in certain weeks or months.

[9] "Because the elements of a prima facie case of retaliation are essentially identical under the FLSA and Title VII, . . . Title VII case law is instructive here." *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 73 (D.D.C. 2009).  The Court thus draws from both Title VII and FLSA case law in its analysis of Ms. Benton's FLSA retaliation claim.

[10] In her deposition, Ms. Benton recalled that her first overtime complaint actually occurred in May 2013, not June 2013.  *See* Benton Dep. 81:17–21.

failure to pay its employee overtime, and that "eventually, after Plaintiff continued to complain that she had not been properly compensated with overtime pay," she was terminated on May 16, 2014, "in retaliation for complaining and asserting her rights to unpaid overtime under the FLSA." *Id.* ¶¶ 18, 21–23, 49–54. The Fund argues that it is entitled to summary judgment as a matter of law because Ms. Benton did not engage in statutorily protected activity or establish a causal connection between any protected activity and a materially adverse action, and thus she failed to state a prima facie case of retaliation under the FLSA. Def.'s Mot. Summ. J. at 2–3. Additionally, the Fund maintains that even if Ms. Benton did establish a prima facie case of retaliation, she has failed to rebut the Fund's legitimate, non-retaliatory explanation for its actions. *Id.* The Court agrees.

Under the FLSA, it is unlawful for an employer to "[d]ischarge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3). To state a prima facie case of retaliation under the FLSA, "a plaintiff is required to show that (1) he made an FLSA complaint or otherwise engaged in protected conduct; (2) the defendant was aware that he had engaged in protected activity; (3) the defendant took an action that was materially adverse to the complainant and sufficient to dissuade a reasonable employee from further protected activity; and that (4) there was a causal relationship between the two." *Del Villar v. Flynn Architectural Finishes, Inc.*, 893 F. Supp. 2d 201, 213 (D.D.C. 2012*).*

Once the employee has established a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. At that point, the *McDonnell Douglass* burden-shifting framework falls away, and the question for the Court becomes "whether the plaintiff produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff" for engaging in statutorily protected activity. *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). To answer this question, the Court must consider "all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful retaliation), and any properly considered evidence supporting the employer's case." *See Cooke v. Rosenker*, 601 F. Supp. 2d 64, 74 (D.D.C. 2009).

### 1. Protected Activity

When considering Ms. Benton's claim of retaliation for asserting her FLSA rights, the Court begins with the threshold question of whether she engaged in activity protected under the FLSA.[11] In her complaint, Ms. Benton alleged that she engaged in protected activity beginning in June 2013, when she and her co-workers told the Fund's director that "the Department of Labor was auditing another labor organization because it was not paying its employees for overtime hours worked." Compl. ¶ 18. The Fund maintains that participating "in a group discussion about how another labor organization compensates its instructors for overtime" does

---

[11] The Fund does not argue that in the absence of enterprise coverage, it is not subject to the FLSA's antiretaliation provisions. The Court therefore proceeds on the assumption that the Fund is subject to 29 U.S.C. § 215(a)(3). *See Sapperstein v. Hager*, 188 F.3d 852 (7th Cir. 1999) (holding that plaintiff can bring FLSA retaliation claim against employer not covered by the FLSA overtime provision); *Wirtz v. Ross Packaging Co.*, 367 F.2d 549 (5th Cir. 1966) (same); *but see Lamont v. Frank Soup Bowl, Inc.*, No. 99-civ-12482, 2001 WL 521815 (S.D.N.Y. 2001) (holding that FLSA's anti-retaliation provision only applies to those subject to individual or enterprise coverage).

not qualify as filing a complaint under the FLSA because Ms. Benton did not assert or advocate her statutory rights.  Def.'s Mot. Summ. J. at 14–15.[12]  In opposition, Ms. Benton argues that informal, oral complaints to an employer are protected under the FLSA, such that her oral complaints about unpaid overtime constitute protected activity.  Pl.'s Opp'n at 8–9.

Ms. Benton is correct that a complaint need not be written to qualify as protected activity under the FLSA.  A plaintiff may establish that she engaged in statutorily protected activity by showing that she made an appropriate written or oral complaint to a government agency, *see Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334 (2011), or by showing that she made such a complaint to her employer.[13]  Regardless of whether a complaint is written or oral, it is deemed "filed when a reasonable, objective person would have understood

---

[12] The Fund also notes that Ms. Benton's statement of facts includes a contention that she engaged in statutorily protected activity when speaking to an EJC volunteer about the overtime issue, but that no such assertion was included in her complaint.  Def.'s Mot. Summ. J. at 15–16. In any case, the Fund argues, because the director and board were not aware of that action it could not support a claim of retaliation.  *Id.*  In her opposition, Ms. Benton makes no mention of her interaction with EJC when arguing that she engaged in protected activity, and thus the Court deems the matter conceded.  *See Burke v. Inter–Con Sec. Sys., Inc.*, 926 F. Supp. 2d 352, 356 (D.D.C. 2013) (plaintiff conceded arguments raised in defendant's motion for summary judgment by failing to oppose those arguments in plaintiff's opposition memorandum and sur-reply); *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded[.]").

[13] Although this Circuit Court has yet to address the issue, the overwhelming majority of circuits have held that making an appropriate complaint to an employer is protected activity under the FLSA.  *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 113 (2d Cir. 2015); *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 436 (4th Cir. 2012); *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 626 (5th Cir. 2008); *Lambert v. Ackerley*, 180 F.3d 997, 1004 (9th Cir. 1999); *Valerio v. Putnam Assocs.*, 173 F.3d 35, 44 (1st Cir. 1999); *EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985, 989–90 (6th Cir. 1992); *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir. 1975).

the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Id.* at 1335 (internal quotation marks omitted). Such a complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.*

Ms. Benton argues that she made such a complaint on three occasions: first, when she "brought to the attention of her Director, Lou DeGraff, the issue of not being paid overtime for her work on Saturdays," Pl.'s Opp'n at 8–9 (citing Benton Dep. 81:17–21, 85:5–13; 86:5–22), second, when she "brought up the issue of overtime wages" at a staff meeting with Mr. Meighan, *id.* at 9 (citing Benton Dep. 97:12–98:2), and third, when she "brought the issue of her entitlement to overtime wages for hours she worked in 2008-2012 up to Anthony Frederick, a Fund Board Member," *id.* (citing Benton Dep. 241:9–242:6). As the Fund correctly points out, however, the deposition testimony on which Ms. Benton relies does not, in fact, support her characterization of the events in question.

First, while Ms. Benton asserts that she "brought to the attention of her Director, Lou DeGraff, the issue of not being paid overtime for her work on Saturdays," Pl.'s Opp'n at 8–9 (citing Benton Dep. 81:17–21, 85:5–13; 86:5–22), the deposition testimony in question shows only that she informed Mr. DeGraff that she had heard that *other* training funds were being investigated for possible overtime violations related to Saturday training sessions. Specifically, Ms. Benton testified that in May 2013, it was brought to her attention "that other funds were being audited for training classes that they had performed on Saturdays" without paying overtime, Benton Dep. 81:17–21, that Mr. DeGraff subsequently told the Fund's employees to look for their "original employment letters because if there was an issue, he was going to look into it and see what he could do to get [them] compensated," *id.* at 85:5–13, and that Mr.

DeGraff "obviously got very worked up about it" whenever she "brought it up to him," *id.* at

86:5–22.  Ms. Benton later clarified that what she told Mr. DeGraff was that she "had heard other

6 above Training Funds were being audited for classes performed on Saturday."  Benton Dep.

88:11–13.

      "Not all amorphous expressions of discontent related to wages and hours constitute

complaints filed within the meaning of § 215(a)(3)."  *Hicks v. Ass'n of Am. Med. Colleges*, 503

F. Supp. 2d 48, 52 (D.D.C. 2007) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir.

1999)).  An employee need not invoke the FLSA by name to file a complaint, but to be

protected, a complaint must have "some degree of formality," that is to say, it must be

sufficiently clear and detailed to convey to a reasonable, objective person that the employee is

asserting rights protected by the FLSA and "call[ing] for their protection."  *Kasten*, 131 S. Ct. at

1334–35; *see also id.* at 1334 (holding that employer must be "given fair notice that a grievance

has been lodged").  The fact that Ms. Benton passed along news to her employer that other

organizations were being investigated for potential overtime issues—even if that news was not

gladly received or resulted in scrutiny of Fund policies—simply does not show that she

complained about her employer's practices, asserted a right to overtime pay, or called for the

protection of FLSA rights in a manner sufficiently clear and detailed to be understood by a

reasonable employer as the filing of a grievance.  *Cf. McKenzie v. Renberg's Inc.*, 94 F.3d 1478,

1486 (10th Cir. 1996) (holding that where plaintiff "informed the company that it was at risk of

claims that might be instituted by others as a result of its alleged FLSA violations," but never

"lodged a personal complaint . . . asserting a right adverse to the company," she did not engage

in activity protected under the FLSA anti-retaliation provision); *Miller v. Health Servs. for*

*Children Found.*, 630 F. Supp. 2d 44, 59 (D.D.C. 2009) (holding that employee who "made no

reference to the FLSA or her legal rights . . . [or] mention possible legal action" did not engage in protected activity where she complained about the time-consuming demands of her work and asked when a vacancy would be filled).

Ms. Benton next argues that she filed a complaint in June or July of 2013 when she "again brought up the issue of overtime wages at a staff meeting" with Mr. Meighan.  Pl.'s Opp'n at 9 (citing Benton Dep. 97:12–98:2).  The testimony to which Ms. Benton cites, however, actually states that she does not recall who raised the issue at the meeting, just that "someone" did.  Benton Dep. 97:12–98:2 ("[I]t may have been myself or David, someone raised the question about the Saturdays again at that meeting.  That's when Mr. Meighan got up and left the room."); *see also* 87:2–17 ("I'm not sure who brought it up, but it surfaced again . . . .").  The fact that Ms. Benton attended a general staff meeting wherein *someone* asked a question about overtime falls well short of showing that she filed a complaint protected by the FLSA.  *Cf. Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 59-60 (D.D.C. 2012) (finding sufficient plaintiff's allegations that he engaged in protected activity by writing e-mails to his employer challenging the FLSA exempt classification of his position, asserting that he was not being paid sufficient overtime, and challenging their overtime pay calculations).

Finally, Ms. Benton contends that she engaged in protected activity in March or April of 2014 when she "brought the issue of her entitlement to overtime wages for hours she worked in 2008-2012 up to Anthony Frederick, a Fund Board Member." *id.* (citing Benton Dep. 241:9–242:6).  If Ms. Benton did complain to Mr. Frederick about unpaid overtime hours worked between 2008 and 2012, the deposition testimony that she cites offers no such indication.  Rather, Ms. Benton testified that she "wasn't sure exactly what [her] rights were," and that she "sought out advice in that regard" from, among other people, Anthony Frederick.  Benton Dep.

241:1–17.  Far from asserting her FLSA rights to her employer, Ms. Benton apparently made

only an inquiry as to what her rights were.  This falls well short of providing an employer "fair

notice that a grievance has been lodged."  *See Katsen*, at 1334; *see also Miller v. Health Servs.

for Children Found.*, 630 F. Supp. 2d 44, 49 (D.D.C. 2009) (rejecting FLSA retaliation claim

where plaintiff failed to "connect her supposed complaint to the assertion of protected rights").

    None of the three instances to which Ms. Benton points in an effort to show that she

engaged in protected activity support her assertion that she filed an FLSA complaint, and in the

absence of such a showing, no reasonable jury could find that she was retaliated against for

engaging in activity protected under the FLSA.

## 2.  Evidence of Retaliation

    Alternatively, even if the Court were to assume that Ms. Benton's three purported

complaints were statutorily protected activities, the Fund would still be entitled to summary

judgment because the record evidence does not support Ms. Benton's claim that the Fund

retaliated against her for making those complaints by taking away her company phone, not

assigning her to work Saturdays in Virginia, and terminating her.[14]

---

[14] Ms. Benton's opposition to the Fund's motion for summary judgment contains a
lengthy list of other allegedly retaliatory adverse actions, including: changing her "work
environment," being treated "worse" by Mr. Meighan, not getting an explanation about why her
work phone was cancelled, taking away her automobile insurance coverage, being
"micromanaged," being "yelled at and treated unprofessionally," and having her responsibilities
reduced.  Pl.'s Opp'n at 10.  None of these alleged retaliatory acts, however, were included in her
complaint, and many are without support in the summary judgment record.  *See, e.g.,* Benton
Dep. 261:5–9 (conceding that she was given the explanation that she would not need a work cell
phone anymore since she would only be working out of the D.C. office); *id.* at 227:5–18
(admitting that Ms. McNelis, who took over "a lot of" Ms. Benton's responsibilities, did so as of
January 2013, well before Ms. Benton made any complaints).  It is well-established that a
plaintiff may not amend her complaint in an opposition brief, and the Court will not permit Ms.
Benton—who is represented by counsel—to so circumvent the requirements of Federal Rule of
Civil Procedure 15.  *See District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010)

In her deposition, Ms. Benton testified that she first raised the overtime issue with her employer in May 2013.  *See* Benton Dep. at 81:17–82:2.  Defendants have produced undisputed evidence showing that the decisions to cancel Ms. Benton's work cell phone and to have her work only regular business hours in the Fund's DC office were made by Mr. Meighan on April 26, 2013, in an effort to reduce unnecessary expenses.  Def.'s Ex. 16, ECF No. 15-18.  Given the undisputed evidence that both decisions were made before Ms. Benton claims she raised any overtime complaint, no reasonable jury could find that the decision was made in retaliation for a complaint that had yet to occur.  *See Hill v. Kempthorne*, 577 F. Supp. 2d 58, 66 (D.D.C. 2008) (an alleged adverse action that occurred two months prior to protected activity "cannot in any sense constitute reprisal for the protected activity").

As for Ms. Benton's claim that she was terminated on May 16, 2014 in retaliation for complaints made in May 2013, June or July 2013, and March or April 2014, the Fund has proffered a legitimate, non-retaliatory explanation for its decision: Ms. Benton's work performance had declined, and she failed to comply with Fund policies.  Although Ms. Benton disputes the Fund's purported rationale for her termination, she has admitted the following facts:[15]

---

("It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing."); *Blue v. Fremont Inv. & Loan*, 584 F. Supp. 2d 10, 13 (D.D.C. 2008) (disallowing plaintiffs' effort to re-write their complaint via an opposition brief); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempt to broaden basis of conspiracy claims and thereby amend its complaint in opposition to motion for summary judgment); *Sharp v. Rosa Mexicano*, 496 F. Supp. 2d 93, 97 n. 3 (D.D.C. 2007) ("[P]laintiff may not, through summary judgment briefs, raise the new claims . . . because plaintiff did not raise them in his complaint, and did not file an amended complaint.").  The Court therefore limits its analysis to the claims of retaliation set forth in Ms. Benton's complaint.

[15] As discussed previously, "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the

- On July 29, 2013, Ms. Benton worked beyond her normal hours without prior, written authorization as required by Fund policy, and she was instructed not to do so again. Def.'s SOF ¶¶ 83–84; Def.'s Ex. 18, ECF No. 15-20.

- On September 11, 2013, Ms. Benton again worked beyond normal hours without prior approval in violation of Fund policy, and she was officially reprimanded for doing so.  Def.'s SOF ¶¶ 85–86; Def.'s Ex. 19 ("As a result of your knowingly violating the Training Fund's policies, I am placing this e-mail in your file as an official record . . . .").

- As of January 22, 2014, Ms. Benton had not complied with Ms. McNelis's repeated requests to change over from a personal to a work e-mail account and to submit all office account information and passwords.  Def.'s SOF ¶¶ 98–99; Def.'s Ex. 20, ECF No. 15-22.

- On January 24, 2014, Ms. McNelis spoke with Ms. Benton about inputting apprentices' information into the system because the reports Ms. Benton ran for the January 2014 Board meeting were incorrect.  Def.'s SOF ¶ 100; Def.'s Ex. 21, ECF No. 15-23.

- On February 24, 2014, Ms. Benton misspelled three individuals' names on cards and the three cards had to be voided.  Def.'s SOF ¶ 101, Def.'s Ex. 22, ECF No. 15-24.

---

statement of genuine issues filed in opposition to the motion."  *See Trawick v. Hantman*, 151 F. Supp. 2d 54, 59 (D.D.C. 2001) (quoting LCvR 7.1(h)).

- On February 27, 2014, Ms. McNelis had to instruct Ms. Benton regarding how to properly handle petty cash because she had done so in a disorganized and improper manner. Def.'s SOF ¶ 102; Def.'s Ex. 23, ECF No. 15-25.

- On March 4, 2014, Ms. Benton admitted to having overpaid an individual's stipend, Def.'s SOF ¶ 103; Def.'s Ex. 24, ECF No. 15-26, and Ms. McNelis again had to remind her not to use her personal e-mail address for work correspondence, Def.'s SOF ¶ 104; Def.'s Ex. 25, ECF No. 15-27.

- On April 2, 2014, Ms. Benton again provided the petty cash receipts in a disorganized manner. Def.'s SOF ¶ 105; Def.'s Ex. 26, ECF No. 15-28.

- On April 30, 2014, Ms. Benton failed to have the petty cash paperwork completed at the time she had promised, resulting in a Fund employee having to wait around the office for several hours for her to complete the work. Def.'s SOF ¶ 106; Def.'s Ex. 27, ECF No. 15-29.

- On May 5, 2014, Ms. Benton admitted that she forgot to copy a batch of signed checks before mailing them. Def.'s SOF ¶ 107; Def.'s Ex. 28, ECF No. 15-30.

- On May 15, 2014, Ms. Benton used her work computer to access facebook, and on other occasions she used her work computer for personal financial matters and to perform work related to her outside employment as a band manager. Def.'s SOF ¶¶ 87–89; Benton Dep. at 251:8–254:18, 298:12–302:4; Def.'s Ex. 29, ECF No. 15-31.

While Ms. Benton concedes these facts, she argues that a jury could nevertheless infer that her termination was retaliatory via a showing of temporal proximity. Pl.'s Opp'n at 10–11. Ms. Benton is mistaken. First, the May and June 2013 complaints are simply too far removed

from her May 2014 termination to support such an inference absent other evidence of causation. *See Davis v. George Washington Univ.*, No. 12–CV–1431, 26 F. Supp. 3d 103 (D.D.C. Mar. 20, 2014) (citations omitted) ("[A] three to four month gap between the protected activity and the adverse employment action is too great to establish an inference of causation, when premised on temporal proximity alone."); *Mayers v. Laborers' Health and Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007) (eight-month gap between protected activity and adverse employment action was "far too long" to infer causation). And second, the fact that her 2014 complaint occurred a month or two prior to her termination, standing alone, is not enough to cast doubt on the Fund's legitimate, non-retaliatory explanation for her termination. Where an employer has come forward with a proffered legitimate, non-retaliatory explanation for an adverse action, temporal proximity alone is insufficient to rebut that legitimate proffer. At this point, "positive evidence beyond mere proximity is required to defeat the presumption that the [employer's] proffered explanations are genuine." *Hamilton v. Geithner*, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)).

In a final effort to show that the Fund's explanation for her termination is not credible, Ms. Benton argues that the proffered non-retaliatory rationale contradicts the Fund's earlier representation to the District of Columbia Department of Employment Services ("DOES") that she was "laid off for lack of work," Pl.'s Opp'n at 12 (citing DOES Letter, Pl.'s Ex. 2, ECF No. 16-2), and that Mr. Mejia committed identical infractions without being terminated. *Id.* She therefore concludes that she has raised a genuine issue of material fact regarding whether the Fund's explanation for her termination was pretextual and whether she was in fact fired in retaliation for engaging in statutorily protected activities. The Court considers each argument in turn.

Evidence that an employer has provided contradictory or inconsistent justifications for an employee's termination can support a finding of pretext.  *See, e.g., Ferguson v. Small*, 225 F. Supp. 2d 31, 40-41 (D.D.C. 2002) (holding that "[t]he conflicting explanations given by defendant's agents for [the plaintiff's] termination [were] also sufficient to raise a reasonable inference that defendant's proffered reasons for the termination [were] pretextual.").  In this case, however, Ms. Benton relies not on a contradictory statement made by the Fund, but on a contradictory finding made by a DOES claim examiner, who "determined that [Ms. Benton] was laid off for lack of work" and was thus eligible for unemployment compensation benefits.  DOES Letter, Pl.'s Ex. 2.  The Fund, moreover, has provided a sworn declaration from Ms. McNelis explaining that after Ms. Benton's termination, she received a "Request for Separation Information" form from DOES that she never returned, and that when she was called by DOES, she stated only that Ms. Benton "was not terminated for 'gross misconduct.'"  McNelis Decl. ¶¶ 3–5, ECF No. 19-1.  Ms. Benton offers no evidence that contradicts Ms. McNelis's explanation, and the statement that Ms. Benton was not terminated for "gross misconduct" does not contradict the Fund's proffered non-retaliatory explanation for Ms. Benton's termination.  *Cf. Johnson v. Perez*, 66 F. Supp. 3d 30, 39 (D.D.C. 2014) (holding that there was "nothing contradictory" about statements that employee was fired:  (1) to "support [the employee's] supervisor," (2) because the employee "could not 'do the work,'" and (3) because of "dissatisfaction with [the employee's] argumentative demeanor" and "reported lack of performance"); *see also Allen v. Johnson*, No. 13-5170, 2015 WL 4489510, at *4 (D.C. Cir. July 24, 2015) (holding that "judgment in an employer's favor is appropriate where the plaintiff's evidence calling the employer's proffered reason into doubt is weak, and the record also contains abundant and

uncontroverted independent evidence that no [retaliation] had occurred" (internal quotation marks omitted)).

This leaves only Ms. Benton's assertion that because Mr. Mejia committed identical infractions and faced dissimilar punishment, she has shown that the Fund's explanation for her termination is unworthy of belief.  Certainly, evidence that a similarly situated employee who did not engage in protected activity received more favorable treatment is probative of pretext.  *See Felder v. Johanns*, 595 F. Supp. 2d 46, 65 (D.D.C. 2009).  But Ms. Benton has not provided evidence of that nature.  Although it is undisputed that both Ms. Benton and Mr. Mejia violated the Fund's overtime policy on September 11, 2013, Ms. Benton admits that the violation was her idea and that both of them received the same official reprimand for the incident.  Benton Dep. at 233:7–236:14.  Moreover, that infraction was only one of nearly a dozen attributed to Ms. Benton, and she does not suggest that Mr. Mejia committed a similar number of mistakes or infractions.  Ms. Benton has thus failed to show that she was similarly situated to Mr. Mejia in all relevant respects such that his continued employment at the Fund could be considered evidence of pretext.  *See Adair v. Solis*, 742 F. Supp. 2d 40, 53 n. 12 (D.D.C. 2010) ("To show that another individual is similarly situated, Plaintiff must demonstrate that all of the relevant aspects of their employment situation are nearly identical.  Therefore, when, as here, an employer states that it took an adverse employment action due to the plaintiff's misconduct, the plaintiff's comparator must have been charged with a comparable offense and then treated less harshly than the plaintiff." (internal quotation marks and citation omitted)).  In fact, Mr. Mejia's treatment effectively supports the Fund's proffered non-retaliatory explanation, because Ms. Benton testified that Mr. Mejia engaged in largely the same FLSA-protected activities, and he remains employed by the Fund.  *See* Benton Dep. at 88:2; 97:11–19.

Accordingly, the Court finds that Ms. Benton has not produced sufficient evidence for a reasonable jury to find that the Fund's asserted non-retaliatory reason for her termination was not the actual reason, and that the Fund intentionally retaliated against her in violation of the FLSA. The Fund is therefore entitled to summary judgment as to Ms. Benton's claim of unlawful retaliation in violation of the FLSA.

### C.  DCMWA Overtime Claim

Having disposed of Ms. Benton's two FLSA claims, the Court now turns to Ms. Benton's claim for unpaid overtime wages and liquidated damages pursuant to the DCMWA.  As stated in Ms. Benton's complaint, 28 U.S.C. § 1367 gives this Court supplemental jurisdiction over state law claims brought within the same case or controversy as claims over which this Court has original jurisdiction, like Ms. Benton's FLSA claims.  *See* 28 U.S.C. § 1331.  However, a court may decline to exercise supplemental jurisdiction where, as here, the "court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Indeed, the Second Circuit has advised that courts "should ordinarily dismiss the state claims" "[w]hen all bases for federal jurisdiction have been eliminated."  *Bhd. Of Locomotive Eng'rs Div. 269 v. Long Island R.R.*, 85 F.3d 35, 39 (2d Cir. 1996); *see also Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 91 (E.D.N.Y. 2010) (declining to exercise supplemental jurisdiction over state law claim for unpaid wages after granting employer's motion for summary judgment on FLSA claims).  And in this instance, Ms. Benton has asserted no basis for this Court's jurisdiction over her DCMWA claim apart from supplemental jurisdiction under 28 U.S.C. § 1367.

The Court is therefore inclined not to exercise supplemental jurisdiction over Ms. Benton's DCMWA claim.  However, in light of the fact that the Court is affording Ms. Benton a 14-day window in which to seek leave to amend her FLSA overtime claim, and because Ms.

33

Benton's DCMWA claim largely mirrors the FLSA claim, the Court will dismiss Ms. Benton's state-law claim without prejudice subject to the amendment of her FLSA claim.

## V.  CONCLUSION

For the foregoing reasons, the Court denies Ms. Benton's motion for partial summary judgment, grants the Fund's cross-motion for summary judgment as to the FLSA overtime and retaliation claims, and dismisses without prejudice the DCMWA overtime claim.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 10, 2015                                          RUDOLPH CONTRERAS
                                                                United States District Judge