## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ERIN BENTON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1073 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 31, 32 |
| | : | | |
| LABORERS' JOINT TRAINING FUND, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### Denying Defendant's Motion for Summary Judgment and
### Denying Plaintiff's Motion for Summary Judgment

## I.  INTRODUCTION

Plaintiff Erin Benton brought this action alleging that her former employer, Defendant Laborers' Joint Training Fund ("the Fund"), failed to pay her overtime wages in violation of the Fair Labor Standards Act ("FLSA") and the D.C. Minimum Wage Revision Act ("DCMWRA"). The Court previously granted summary judgment to the Fund on Ms. Benton's FLSA overtime claim (as well as her related retaliation claim), after finding that Ms. Benton failed to establish that the Fund is a covered enterprise under the FLSA.  *See generally Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41 (D.D.C. 2015).  The Court permitted Ms. Benton "to seek leave to amend her complaint to include a claim of individual coverage based on interstate travel," however, *id.* at 54, and the Court granted Ms. Benton's subsequent motion to amend to the extent it sought leave to add allegations of individual FLSA coverage, *see generally Benton v. Laborers' Joint Training Fund*, No. 14-1073, 2015 WL 7737304 (D.D.C. Dec. 1, 2015).

The parties have again filed cross-motions for summary judgment.  The Fund moves for summary judgment on the FLSA claim, arguing that Ms. Benton fails to establish individual

FLSA coverage and that, in any event, she is exempt from the FLSA's overtime provisions because she worked in a bona fide administrative position. *See* Def.'s Mot. Summ. J., ECF No. 31; Def.'s Mem. Law Supp. Def.'s Mot. Summ. J. at 12–21, ECF No. 31-1 ("Def.'s Mem. Supp. Mot. Summ. J."). Because it contends that summary judgment should be entered in its favor on the FLSA claims, the Fund argues that the Court should decline to exercise supplemental jurisdiction over the DCMWRA claim or otherwise grant summary judgment in its favor because the same administrative exemption applies. *See* Def.'s Mem. Supp. Mot. Summ. J. at 21–22. For her part, Ms. Benton seeks summary judgment on both claims, asserting that she is owed $6,194.34 in unpaid wages for hours that she worked between June 25, 2011, and December 31, 2012, and that she should be awarded an equal amount in liquidated damages under the FLSA and DCMWRA. *See* Pl.'s Mot. Summ. J. at 18, ECF No. 32; *see generally* Pl.'s Mem. Supp. Mot. Summ. J., ECF No. 32-1. Upon consideration of the parties' motions, the memoranda in support thereof and opposition thereto, and the summary judgment record, the Court finds that genuine issues of fact exist regarding Ms. Benton's coverage under the FLSA and, if she is covered, whether she is exempt from the Act's overtime requirement because of her position. Accordingly, the Court will deny both parties' motions.

## II.  FACTUAL BACKGROUND

The Fund is a non-profit 501(c)(5) organization "designed to provide training to members of two labor unions in the Washington, D.C. Metropolitan Area: Laborers' International Union of North America ('LIUNA') Local 657 and Local 11." Def.'s Stmt. Material Facts Not in Genuine Dispute ¶¶ 1, 4, ECF No. 31-2 ("Def.'s SOF"). The Fund provides labor training on various subjects concerning the construction industry, specifically, *see id.* ¶ 8, and "the purpose of the Training Fund is to provide unique training to construction laborers who are members of

LIUNA to help them qualify for work and to get better work," *see* Dep. Erin Benton at 18:13–18, ECF No. 31-4 ("Benton Dep."). The organization is a third-party recipient of contributions made pursuant to collective bargaining agreements entered into between the union and employers, and additional funding comes from federal, local, and union grants. Def.'s SOF ¶¶ 5, 6.

Ms. Benton was a full-time, salaried employee of the Fund from January 1, 2003, until her termination on May 16, 2014. Pl.'s Resp. Def.'s Interrog. No. 7, ECF No. 32-5. At times, and beginning after Shannon Jones became director of the Fund in August 2007, Ms. Benton traveled to the Fund's training location in Alexandria, Virginia from the Fund's offices in Washington, D.C. to perform some of her job duties. Benton Dep. at 114:8–12, 116:7–11, 117:17–118:2; *see* Decl. Shannon Jones ¶ 2, ECF No. 31-11 (Jones Decl.). Ms. Benton testified that how often she traveled there "depended on the schedule," but that she was at the Virginia site on some occasions "twice a week," and on others "four days a week." Benton Dep. at 116:9–11. The Fund "admits that [Ms. Benton] did perform" what it characterizes as "very limited work at the Fund's satellite office in Virginia on occasion," but the Fund contends that it lacks sufficient information to determine how often Ms. Benton traveled to that office or whether she traveled from the Fund's Washington office or Ms. Benton's home in Maryland. Def.'s Mem. Supp. Mot. Summ. J. at 13, ECF No. 31-1. Indeed, an e-mail in April 2013 from Justin Meighan, the chairman of the Fund's Board of Trustees, sought "[c]onfirmation that [Ms. Benton] will work only out of [the] Local 657 office," and requested that her cell phone be cancelled since she would be working "at a single site." Def.'s Ex. 16, ECF No. 31-18. These requests suggest that Ms. Benton did in fact work at other locations on occasion.

On a number of occasions, Ms. Benton also traveled to and worked at the Virginia training center during Saturday training sessions put on by the Fund. *See* Progress Report, ECF

No. 31-32.  At the Saturday trainings, she processed classes and issued certificates and state

licenses to attendees.[1]  Benton Dep. at 267:13–15.  She estimates that, as a result, she worked

595.5 hours of overtime from 2008 through 2012.  Pl.'s Suppl. Resp. Interrog. No. 15, ECF No.

32-12.  The Fund disputes the number of hours and instances Ms. Benton claims that she worked

on Saturdays, but does not otherwise dispute that Ms. Benton made some Saturday trips to the

Virginia site.  *See* Def.'s Resp. Pl.'s Stmt. Material Facts Not in Dispute ¶ 16, ECF No. 33-1.

Ms. Benton testified that her travel to Virginia ceased around April 26, 2013.  *See* Benton Dep.

at 261:5–7.

　　　The parties dispute whether Ms. Benton had an official job title, but she was at times

referred to as an "Administrative Assistant," Def.'s Ex. 12 at 6, ECF No. 31-14, and at other

times referred to as the "Office Manager," Def.'s Ex. 13, ECF No. 31-15, or the "Assistant to

[the] Director," Def.'s Ex. 15, ECF No. 31-17.  When she was first hired, Ms. Benton's

responsibilities included clerical duties, filing reports, implementing a database, assisting the

director of the Fund, supporting the Fund's instructors, and providing customer service to the

Fund's members.  Benton Dep. at 22:7–11.  By 2006, however, Ms. Benton had gained

experience at the Fund and the director during her initial period of employment, Kelly Lapping,

had been replaced by an individual who was less familiar with the role, so Ms. Benton took on

---

[1] As explained in more detail below, *see infra* note 4, the Court construes this evidence to refer to weekday trips to the Fund site in Virginia and separate, Saturday trips to that site.  The nature of Ms. Benton's work at the Virginia site on non-Saturdays is not made clear in the record.  Ms. Benton's statement of facts claims that she traveled to the Virginia site to "process classes and issue certifications and state licenses," but the parts of her deposition she cites discuss those responsibilities only in relation to her *Saturday* trips to the Virginia site.  *Compare* Pl.'s Mem. Supp. Mot. Summ. J. at 4 ¶ 15, *with* Benton Dep. at 267:11–17.  Similarly, one of Ms. Benton's co-workers discusses her activities at the Virginia site but only discusses accompanying her there on Saturdays.  *See* Deposition of David Mejia at 26:2–21, ECF No. 31-7 ("Mejia Dep.") (discussing Saturday work at the Virginia training center and Ms. Benton's responsibilities at those Saturday sessions).

greater responsibilities in assisting the director, communicating with the Fund's third-party administrator about the Fund's bills, and obtaining grants for the Fund. *Id.* at 26:2–36:12; 52:13–56:18. Among other things, Ms. Benton also reconciled the petty cash book, processed checks for stipends, ordered office supplies and meals for trainings, assisted in creating the Fund's training schedules, solicited bids for service providers and rental equipment, signed a $35,220 lease for a copier, and kept the office running while the director was out. *Id.* at 41:16–48:8, 58:18–59:13, 127:17–128:8, 137:19–144:19.

On December 31, 2012, the Fund terminated its relationship with the third-party administrator that had previously handled tasks like administering payroll, benefits, and cutting checks for vendors. Dep. Justin Meighan at 30:17–31:17, ECF No. 31-6 ("Meighan Dep."). The decision to administer the Fund internally was made in an effort to reduce the organization's expenses. Benton Dep. at 61:11–63:12. As a result, Mary McNelis began handling the work related to administering the Fund as of January 1, 2013. *Id.* at 62:2–63:12, 227:5–10. Ms. McNelis "essentially took over a lot of [Ms. Benton's] responsibilities." *Id.* at 227:16–18; *see also* Decl. Mary McNelis ¶ 5, ECF No. 31-13.

During her employment at the Fund, Ms. Benton's annual salary ranged from $50,404 to $54,512. Pl.'s Suppl. Resp. Interrog. No. 15, ECF No. 32-12. She was not paid time-and-half for hours worked on Saturdays, regardless of whether it caused her to work over forty hours in a given week. *Id.*

Ms. Benton was terminated on May 16, 2014, and she initiated this action on June 25, 2014, alleging that she is entitled to unpaid overtime wages for hours worked between February 9, 2008 and April 13, 2013. Compl. ¶¶ 12, 40, ECF No. 1. Counts I and II of her complaint alleged violations of the overtime provisions of the FLSA and the DCMWRA, respectively, *id.*

¶¶ 36–48, while Count III of Ms. Benton's complaint alleged that she was unlawfully terminated "in retaliation for complaining and asserting her rights to unpaid overtime wages under the FLSA," *id.* ¶¶ 18–24, 49–56.  In a prior Memorandum Opinion, the Court granted summary judgment to the Fund on Ms. Benton's FLSA overtime claim (as well as her related retaliation claim), after finding that Ms. Benton failed to establish that the Fund is a covered enterprise under the FLSA.  *See generally Benton*, 121 F. Supp. 3d 41.  In her Second Amended Complaint, Ms. Benton now alleges that she is covered by the FLSA's individual coverage because she "regularly and customarily crossed state lines" in the "course of performing her job duties."  2d Am. Compl. ¶ 3, ECF No. 27.  She again seeks overtime compensation and liquidated damages under the FLSA and the DCMWRA for hours she worked while employed at the Fund.[2]  *Id.* ¶¶ 28–40.

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law."  Fed. R.

---

[2] Ms. Benton's Second Amended Complaint alleges that she is owed overtime for the entire period between February 9, 2008 and April 13, 2013, and alleges that equitable tolling applies to allow her to assert claims for this entire period.  *See* 2d Am. Compl. ¶ 21; *see also id.* ¶¶ 18–20.  Yet, Ms. Benton's motion for summary judgment acknowledges that a two year statute of limitations generally applies to FLSA claims, except if an employer's violation is willful, and a three year statute of limitations applies under the DCMWRA, *see* Pl.'s Mem. Supp. Mot. Summ. J. at 17 & n.8; *see also* 29 U.S.C. § 255(a); D.C. Code § 32-1013 (1993); D.C. Code § 32-1308(c)(1) (codifying D.C. statute of limitations after 2015 amendment, which maintains a three year statute of limitations).  Her motion also seeks damages only for overtime worked since June 25, 2011—three years before she initiated this lawsuit—and does not seek any damages for time worked between February 9, 2008 and June 25, 2011.  *See* Pl.'s Mem. Supp. Mot. Summ. J. at 2 ¶ 4 & n.2.  Unlike her prior motion for summary judgment, which asserted that she would "continue to pursue" her tolling claims "at trial," and which was stylized as only a "partial" motion for summary judgment, *see* Pl.'s Mot. Partial Summ. J. at 1 n.1, ECF No. 14, neither her current motion nor her memorandum in support of that motion make any similar assertion, *see generally* Pl.'s Mot. Summ. J.; Pl.'s Mem. Supp. Summ. J.

Civ. P. 56(a); *accord Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (citation omitted).  Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position—"there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252.  Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

When both parties file cross-motions for summary judgment, "each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67

(D.D.C. 2006); *Nuzzo v. FBI*, No. 95-CV-1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996)

("When both parties in a cause of action move for summary judgment, each party must carry its

own burden.").  Finally, the Court notes that "[c]redibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge at summary judgment."  *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C.

Cir. 2013) (citation omitted).  Indeed, a court's role in deciding a summary judgment motion is

not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine

issue for trial."  *Id.* (citation omitted).

## IV.  ANALYSIS

## A.  FLSA Overtime Claim

Ms. Benton's FLSA claim is premised on her allegation that the Fund failed to pay her

time-and-half for overtime hours she worked during Saturday training sessions and otherwise, in

violation of the FLSA.  *See* 2d Am. Compl. ¶¶ 28–34.  "Under the FLSA an employee is

ordinarily entitled to pay equal to one and one-half times his normal hourly wage for all hours

worked beyond forty per week."  *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 892

(D.C. Cir. 2010) (citing 29 U.S.C. § 207(a)(1)).  Ms. Benton seeks summary judgment as to

unpaid overtime wages for hours worked between June 25, 2011 and December 31, 2012.[3]  Pl.'s

---

[3] *See supra* note 2.  In addition, the Court notes that the chart Ms. Benton provides on
page 18 of her memorandum in support of her motion for summary judgment contains two
typographical errors.  First, she appears to have interchanged the number of hours she claims for
2011 with those that she claims for 2012, and vice versa.  *Compare* Pl.'s Mem. Supp. Summ. J.
at 18 (listing 104 hours for 2011), *with* Pl.'s Suppl. Resp. to Interrog. No. 15, ECF No. 32-12
(listing 104 hours for 2012).  In addition, the chart asserts that the 2011 overtime hours begin on
May 25, but her statement of facts makes clear—and the calculation of the relevant hours as
represented in Ms. Benton's supplemental response to the Fund's interrogatories confirms—that
she only seeks overtime pay for hours accrued beginning on June 25, 2011.  *See* Pl.'s Mem.

Mem. Supp. Mot. Summ. J. at 5–18.  The Fund's own motion for summary judgment maintains

that it is entitled to summary judgment as to the entirety of Ms. Benton's FLSA claim because

she has not shown that she is individually covered by the FLSA and, in any event, that even if

she is covered she worked in a bona fide administrative capacity during the relevant time period

and was therefore exempt from the FLSA.  *See* Def.'s Mot. Summ. J. at 12–21.  The Court will

begin its analysis with the coverage issue, and then turn to the exemption issue.  On both fronts,

the Court concludes that the record presents genuine issues of material fact and, therefore, the

parties' respective motions for summary judgment must be denied.

## 1.  FLSA Coverage

Although courts construe the FLSA "liberally to apply to the furthest reaches consistent

with congressional direction," *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296

(1985) (quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)), the reach

of the FLSA's overtime provision is expressly limited to those "employees who in any

workweek [are] engaged in commerce or in the production of goods for commerce, or [are]

employed in an enterprise engaged in commerce or in the production of goods for commerce,"

29 U.S.C. § 207(a)(1).  Accordingly, before an employee can recover overtime wages under the

Act, she must first establish that her employment relationship is subject to coverage under the

FLSA.  *See D.A. Schulte, Inc., v. Gangi*, 328 U.S. 108, 120 (1946) (discussing plaintiff's burden

of establishing individual FLSA coverage); *Malloy v. Ass'n of State & Territorial Solid Waste

Mgmt. Officials*, 955 F. Supp. 2d 50, 54 (D.D.C. 2013) (holding that "enterprise coverage [is] a

substantive ingredient of the plaintiff's [FLSA] claim"); *Ramirez v. Amazing Home Contractors,*

---

Supp. Mot. Summ. J. at 2 ¶ 4 & n.2; Pl.'s Suppl. Resp. to Interrog. No. 15, ECF No. 32-12 (chart
listing hours per week that add up to 57 hours between June 27, 2011 and December 31, 2011).

*Inc.*, 114 F. Supp. 3d 306, 309 (D. Md. 2015) (explaining that "FLSA coverage (individual or enterprise) is an essential element of a plaintiff's FLSA claim").

FLSA coverage comes in two forms: "enterprise" and "individual." *Tony & Susan Alamo Found.*, 471 U.S. at 295 n.8. An employee with "enterprise" coverage works for an employer that is both "an enterprise" and "engaged in commerce or in the production of goods for commerce." *See* 29 U.S.C. § 207(a)(1); *see also Malloy*, 955 F. Supp. 2d at 55 (explaining that to establish enterprise coverage, an employee must first show that the employer is an "enterprise," and then show that the enterprise is "engaged in commerce"). Alternatively, an employee is covered individually under the FLSA if she personally is "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1). A given employee may have coverage under either or both theories, and Ms. Benton initially alleged only enterprise coverage, an issue on which the Court previously granted summary judgment to the Fund. *See Benton*, 121 F. Supp. 3d at 50–53.

Now, in her Second Amended Complaint, Ms. Benton alleges individual coverage. A plaintiff may attempt to show that she is "engaged in commerce" in several ways, including by showing that she is employed in industries that "serve as the actual instrumentalities and channels of interstate and foreign commerce," such as the telephone, transportation, or shipping industries; by showing that she is employed in a type of business that "regularly utilize[s] the channels of interstate and foreign commerce in the course of their operations," such as the banking, insurance, or publishing industries; or by showing that she directly participates in the actual movement of people or goods in interstate commerce. *See* 29 C.F.R. §§ 776.10, 776.11; *see also Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006). Here, Ms. Benton raises only one ground for concluding that she is covered by the FLSA: she alleges that

she was "engaged in commerce" while working at the Fund because "she regularly and customarily crossed state lines."  2d Am. Compl. ¶ 3.

The FLSA's implementing regulations explain that travel across state lines can, in some circumstances, establish individual FLSA coverage.  *See* 29 C.F.R. § 776.12.  The regulation explains that typical types of employment that involve regular interstate travel include "traveling service men, traveling buyers, traveling construction crews, collectors, and employees of such organizations as circuses, carnivals, road shows, and orchestras."  *Id.*  But the regulation elaborates that the "area of coverage in such situations cannot be delimited by any exact formula, since questions of degree are necessarily involved."  *Id.*  Employees who regularly travel "across State lines in the performance of their duties (as distinguished from merely going to and from their homes or lodgings in commuting to a work place) are engaged in commerce and covered by the Act."  *Id.*  But an employee who only "in isolated or sporadic instances, happens to cross a State line in the course of his employment, which is otherwise intrastate in character, is not, for that sole reason, covered by the Act."  *Id.*  Ultimately, the regulation explains that "[d]oubtful questions arising in the area between the two extremes must be resolved on the basis of the facts in each individual case."  *Id.*

There is a paucity of case law examining the facts of individual cases, however, or providing guideposts for how frequently an individual must travel across state lines in order to establish individual coverage.  The parties do not cite any cases, and the Court's own research discloses only three cases discussing the issue in any detail.  *Accord Solano v. A. Navas Party Prod., Inc.*, 728 F. Supp. 2d 1334, 1346 (S.D. Fla. 2010) (explaining that "[t]he case law is very limited on how much travel is required to qualify as 'regular' rather than 'isolated or sporadic,'" and noting that the court found "only . . . one case . . . through independent research").  The

cases that do exist suggest that weekly or bi-weekly travel is almost certainly sufficient to establish individual coverage, while bi-monthly travel approaches the limits of coverage, and more infrequent travel amounting to only sporadic trips each year are insufficient. *See, e.g.*, *Bowrin v. Catholic Guardian Soc'y*, 417 F. Supp. 2d 449, 468–71 (S.D.N.Y. 2006) (concluding that plaintiff employees of an elderly care facility who traveled out of state weekly or two to four times per month with facility residents established individual coverage to survive summary judgment, but those plaintiff employees who traveled out of state on only two occasions during three years of employment or on five instances over a several year period did not establish coverage); *Isaacson v. Penn Cmty. Servs., Inc.*, Nos. 69-878 & 69-879, 1970 WL 794, at *4 (D.S.C. Oct. 19, 1970), *rev'd on other grounds by* 450 F.2d 1306 (4th Cir. 1971) (concluding, after a bench trial, that a plaintiff who "crossed the state line only four times in a period of 19 months," could not "reasonably be construed to have been 'engaging in commerce' as contemplated by the Act"). For example, in *Solano*, the district court concluded that "two [interstate] trips in thirty-six months would be 'isolated or sporadic,' and Plaintiff would not qualify for individual coverage," but it would be a "closer call if Plaintiff can prove he traveled at least fifteen times in connection with his employment." *See* 728 F. Supp. 2d at 1346.

In this case, Ms. Benton claims that the record shows that she "was required to and regularly crossed state lines—as often as four times per week—in the course of her employment." Pl.'s Mem. Supp. Mot. Summ. J. at 6. She claims that she made such trips to "process classes and issue certifications and state licenses," and that, "[f]urther," the Fund required her to work on Saturdays on at least nineteen occasion during the relevant time period at the Alexandria, Virginia training site. *Id.* at 4 ¶¶ 15–16. The connection, if any, between what appear to be workweek trips across state lines (because Ms. Benton claims there were multiple

12

trips in some weeks) and the Saturday trips is not made particularly clear in the record.[4]  In

opposing Ms. Benton's motion for summary judgment and seeking summary judgment in their

own favor, the Fund argues that Ms. Benton's conclusory testimony fails to provide any evidence

concerning the frequency of her interstate travel, whether she traveled from the Fund's office or

from her home, or during what period of her employment she engaged in such travel—and that

the absence of these types of facts are fatal to her effort to show individual coverage.  *See* Def.'s

Mem. Law Opp'n Pl.'s Mot. Summ. J. at 5–6, ECF No. 33 ("Def.'s Opp'n"); *see also* Def.'s

Mem. Supp. Mot. Summ. J. at 13–14.

The Court first considers Ms. Benton's alleged workweek trips to the Virginia training

site, and the Court agrees with the Fund that Ms. Benton fails to provide sufficient evidence from

which the finder of fact could assess whether she traveled across state lines sufficiently

frequently in the performance of her duties to establish individual FLSA coverage.  Ms. Benton

claims that she traveled from Washington, D.C. to Virginia and "performed work duties in

Virginia between two and four times per week in the course of her employment," *see* Pl.'s Mem.

Supp. Mot. Summ. J. at 4 ¶ 15, but this is a charitable and overstated reading of a single line of

testimony in her deposition.  In the context of discussing her use of a Fund credit card, Ms.

Benton stated in passing that she used the card to purchase gas "[f]or traveling to Virginia."

Benton Dep. at 112:15–113:21.  She claimed that her usage of the card "depend[ed] on if I was

going to Virginia, [and] how many times I went."  *Id.* at 115:2–3.  When asked how often she

traveled to Virginia Ms. Benton testified, vaguely, that "it depended on the schedule," and that

---

[4] Indeed, it is not apparent whether Ms. Benton's reference to making two or four trips per week, on some occasions, includes or excludes the Saturday trips.  Even though these trips may overlap somewhat, for clarity, and to distinguish among the factual evidence to which Ms. Benton points, the Court will refer to her "workweek trips" and her "Saturday trips."

"[s]ometimes I was down there twice a week," but "[s]ometimes I was down there four days a week." *Id.* at 116:9–11.

Yet, the problem with the workweek evidence is that it is phrased at such a vague level of generality that it leaves the factfinder unable to assess the frequency with which Ms. Benton traveled across state lines—which is the critical issue in determining whether she is covered. Absent from her testimony's single, passing reference to interstate travel is any discussion of the *frequency* of that travel. *See Bowrin*, 417 F. Supp. 2d at 469–70 (granting summary judgment to defendant for portion of work "performed [for] an otherwise uncovered" employer because "in the absence of evidence as to *the number of out-of-state trips* taken . . . there is no factual basis to support a finding of individual coverage" (emphasis added)). While Benton asserts that there are "multiple sources" in the record corroborating her travels to Virginia, she in fact only points to two: the testimony of Benton herself, and her co-worker, David Mejia. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 7, ECF No. 34 ("Pl.'s Opp'n"); *see also* Pl.'s Mem. Supp. Mot. Summ. J. at 4 ¶¶ 14–16 (citing only deposition testimony from Benton and Mejia). And even Mejia's testimony only discusses Ms. Benton's work on Saturdays. *See* Mejia Dep. at 26:12–15, ECF No. 31-7.

The absence of evidence concerning the frequency of Ms. Benton's travel is particularly problematic given the period of time across which her potential trips spanned. She testified that she began purchasing gas with a Fund credit card when Shannon Jones became director of the Fund, which was in August 2007. *See* Benton Dep. at 117:17–118:2; Jones Decl. ¶ 2. This evidence thus suggests that August 2007 was the earliest she began traveling to Virginia. She also testified that she was instructed to cease traveling or working at the Virginia site as of April 26, 2013. *See* Benton Dep. at 261:5–7. Her travel therefore may have occurred any time during

a nearly six year period.  To be sure, there is no dispute that Ms. Benton did work out of the

Virginia site on some occasions during that time.  The Fund admits as much, Def.'s Mem. Supp.

Mot. Summ. J. at 13, and evidence from April 2013, at which point the chairman of the Fund's

Board of Trustees sought "[c]onfirmation that [Ms. Benton] will work only out of [the] Local

657 office" and requested that her cell phone be cancelled since she would be working "at a

single site," demonstrates that Ms. Benton did, at times, work at other locations.  Def.'s Ex. 16.

Yet, Ms. Benton's overtime claims in this case involve the specific time period between May

2011 and December 2012.  Her testimony provides no temporal context for understanding both

when, during the six-year period between 2007 and 2012, she traveled interstate, and the

frequency with which she traveled during those years.

Coverage decisions based on interstate travel that "aris[e] in the area between the two

extremes" of regular engagement in travel or isolated or sporadic instances of travel "must be

resolved on the basis of the facts in each individual case."  29 C.F.R. § 776.12.  Ms. Benton has

the burden to show that she is covered by the FLSA, *see D.A. Schulte, Inc.*, 328 U.S. at 120, and

to defeat the Fund's motion for summary judgment she must point to "specific facts showing that

there is a genuine issue for trial," *Celotex Corp.*, 477 U.S. at 324.  But, here, Ms. Benton

provides no concrete evidence at all from which a finder of fact could make a determination.  *Cf.*

*Shelton v. Inn at Trivium*, No. 6:08cv00040, 2009 WL 1255465, at *3 (W.D. Va. May 6, 2009)

(denying request for damages on default judgment for period during which the plaintiff "could

not provide any specific examples or estimate what percentage of her job duties was taken up by

the[] tasks" involving interstate commerce).  It would be one thing if Ms. Benton provided an

estimation of the trips she took from the Washington, D.C. office to the Virginia site, or provided

any type of testimony concerning the frequency of those trips during the relevant time period

(June 2011 through December 2012).  If that were the case, the question would turn on her credibility, and it is unlikely the Court could grant summary judgment in either party's favor on this issue.  *See Solano*, 728 F. Supp. 2d at 1346 (concluding that coverage would be a "closer call" if the plaintiff could prove his factual assertions, and finding that "[h]aving the parties more fully present the disputed facts at trial will help the Court determine whether Plaintiff was engaged in commerce").  But here, however, Ms. Benton has provided nothing beyond her conclusory assertion that she traveled on some occasions to the Virginia site two or four times a week.

The Court comes to a different conclusion with respect to Ms. Benton's Saturday trips to the Virginia site to assist with training classes.  For those instances of travel, Ms. Benton does estimate, with specific dates, the nineteen times that she claims to have worked on Saturdays.  *See* Progress Report, ECF No. 31-32.  Nineteen instances of interstate travel over a nineteen month period (averaging one instance of travel per month) would be sufficient to show that Ms. Benton "regularly engaged in traveling across State lines," and thus was covered by the FLSA.  29 C.F.R. § 776.12; *see Solano*, 728 F. Supp. 2d at 1346 (concluding that fifteen instances of travel over a thirty-six month period presented a "close call"); *Bowrin*, 417 F. Supp. 2d at 470 (finding two to four out-of-state trips per month sufficient to establish individual coverage).

Notwithstanding these concrete instances of travel outside of the District of Columbia, where the Fund is based, the Fund argues that Ms. Benton's failure to explain whether she traveled to the site from her home in Maryland is fatal to her ability to invoke those instances as a basis for coverage.  *See* Def.'s Mem. Supp. Mot. Summ. J. at 13; Def.'s Opp'n at 4–6; *see also* 2d Am. Compl. ¶ 1 (alleging that Ms. Benton resides in Maryland).  It is true that the relevant regulation emphasizes that "merely going to and from their homes or lodgings in commuting to a

work place" does not establish that employees are engaged in interstate commerce.  29 C.F.R.

§ 776.12.  Yet, in this instance, it is not quite accurate to describe Ms. Benton's travel as simply

commuting from her home to her place of work because, while her *typical* workplace is in the

District of Columbia, her weekend work took place in a different state.  No case that the Court

has identified involves a type of interstate travel in which the employee works predominantly in

one state but, on occasion, travels from her home to an employer's separate location in a second

state to carry out her duties.  The Fund cites no cases presenting those facts, either.  In the

Court's estimation, that type of scenario, as presented by the facts here, does not fall outside the

regulation's intended scope.  The salient question is whether the employee travels across state

lines "*in the performance of* [her] duties."  29 C.F.R. § 776.12 (emphasis added).  To the extent

she traveled outside of the District of Columbia to Virginia in order to assist in providing training

classes to members of the unions the Fund serves, Ms. Benton's travel was undertaken in the

performance of her work duties.  Thus, even if her journey began from her home, rather than her

typical work location in the District of Columbia, those instances of travel constitute travel

across state lines in the course of her employment.  The Fund does not expressly argue otherwise.

The Fund does dispute, in some respects, the evidence that Ms. Benton provides to

support her claim that she made nineteen trips to Virginia during the relevant time period.[5]  *See*

Def.'s Opp'n at 18 (arguing that the estimation was "not prepared contemporaneously with the

hours worked," assembled "at the direction of her attorney solely for the purposes of calculating

damages in this litigation," were "created from reviewing some, but not all, e-mails and

---

[5] Although the Fund lodges these concerns in opposition to Ms. Benton's motion for summary judgment with respect to the damages issue, *see* Def.'s Opp'n at 17–19, the Court finds that they are equally relevant to determining the factual question of how often Ms. Benton traveled to Virginia in the course of her employment.

documents available," and were "belatedly produced to the Fund"); *see also* Def.'s Resp. Pl.'s

Stmt. Material Facts Not in Dispute ¶ 16.  Because the frequency of travel is critical to

establishing coverage, this dispute is material.  Moreover, whether Ms. Benton can substantiate

her factual claim depends, in part, on assessing her credibility, which is within the province of

the jury.  *See Barnett v. PA Consulting Grp., Inc*., 715 F.3d 354, 358 (D.C. Cir. 2013).

Accordingly, genuine issues of material fact exist regarding whether Ms. Benton has "regularly

engaged in traveling across State lines in the performance of [her] duties" and, thus, whether she

was individually covered by the FLSA.  29 C.F.R. § 776.12; *see Solano*, 728 F. Supp. 2d at 1346

("Having the parties more fully present the disputed facts at trial will help the Court determine

whether Plaintiff was engaged in commerce.").  As a result, the Court must deny both parties'

motion for summary judgment on this threshold issue.

### 2.  Bona Fide Administrative Capacity Exemption

If Ms. Benton is successful in establishing individual coverage, the burden would then

shift to the Fund to show that she falls within one of the exemptions to the FLSA's overtime

requirements.  *Briggs v. Chesapeake Volunteers in Youth Servs., Inc.*, 68 F. Supp. 2d 711, 714

(E.D. Va. 1999) ("Employees seeking compensation based on the FLSA have the burden of

proving that the FLSA applies to their employer/employee relationship . . . .  Once this initial

burden is met, the burden shifts to the employer to establish whether one of the specific

exemptions under the FLSA applies."); *see also Robinson-Smith v. Gov't Emps. Ins. Co.*, 590

F.3d 886, 891 (D.C. Cir. 2010) (holding that the employer bears the burden of establishing that

employee falls within administrative exemption to the FLSA).  The Fund asserts that, even if she

is covered by the Act, the job duties Ms. Benton performed and independent judgment she

exercised as the Administrative Assistant to the Fund's Director qualify her for the FLSA

exemption for "employee[s] employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1); *see* 29 C.F.R. § 541.200(a); *see also* Def.'s Mem. Supp. Mot. Summ. J. at 14–21.[6]

Department of Labor regulations further elucidate the meaning of the term "bona fide administrative capacity."  An employee is only employed in such a capacity if three criteria are established: first, that the employee is compensated "on a salary or fee basis at a rate of not less than $455 per week"; second, that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and, third, that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  In this case, Ms. Benton concedes that she was paid during her employment at the Fund at a rate greater than $455 per week, *see, e.g.*, Pl.'s Opp'n at 8, so the Court will focus only on the second and third showings.

With respect to the second showing, an employee's primary duty is related to the management or general business operations of the employer if the employee's work is "directly related to assisting with the running or servicing of the business, as distinguished from, for

---

[6] The parties dispute Ms. Benton's title, but that issue is not material to the Court's ultimate resolution of whether her job duties render her exempt from the FLSA's overtime requirements.  *See Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 51 (D.D.C. 2006) ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description." (quoting *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 61 (D. Conn. 1997)).  Thus, for purposes of this opinion, the Court will refer to Ms. Benton's position as that of the "Administrative Assistant." In addition, the Fund concedes that Ms. Benton was no longer employed in a bona fide administrative capacity as of January 1, 2013, when another employee, Mary McNelis, took on the role of Fund administrator.  *See, e.g.*, Def.'s Opp'n at 6 n.7.  Because Ms. Benton only seeks overtime for hours worked prior to January 1, 2013, however, this factual assertion is immaterial to the Court's resolution of the parties' motions.

example, working on a manufacturing production line or selling a product in a retail or service

establishment." 29 C.F.R. § 541.201(a).  Among other tasks, management work can encompass

"accounting," "budgeting," "insurance," "purchasing," "procurement," "personnel management"

and "human resources," and "employee benefits." *Id.* § 541.201(b).  But it must encompass

more than simply "the day-to-day carrying out of the business' affairs." *Bothell v. Phase*

*Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002).

   The third prong requires that, in the course of performing those primary duties, the

employee exercises "discretion and independent judgment with respect to matters of

significance." 29 C.F.R. § 541.202(a).  Given this third prong, plaintiffs "would not be exempt if

the *performance* of their work was significant to Defendant, but the matters over which they had

*discretion* were not." *Ruggeri v. Boehringer Ingelheim Pharm., Inc.*, 585 F. Supp. 2d 254, 275

(D. Conn. 2008) (emphasis in original).  Such discretion arises when the employee is tasked with

"the comparison and the evaluation of possible courses of conduct, and acting or making a

decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).  The

employee's degree of discretion must be considered "in the light of all the facts involved in the

particular employment situation in which the question arises," but factors that merit

consideration in that assessment include, among other things: "whether the employee carries out

major assignments in conducting the operations of the business," "whether the employee has

authority to commit the employer in matters that have significant financial impact," and

"whether the employee has authority to negotiate and bind the company on significant matters."

*Id.* § 541.202(b).  An employee must have the authority "to make an independent choice, free

from immediate direction or supervision," but the fact that an employee's "decisions or

recommendations are reviewed at a higher level" does not necessarily preclude application of the

exemption.  *Id.* § 541.202(c).  "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."  *Id.*

The regulations also provide several examples of positions that generally qualify for the administrative exemption.  *See id.* § 541.203.  Of particular relevance to this case is the regulation's inclusion of an "executive assistant or administrative assistant to a business owner or senior executive of a large business."  *Id.* § 541.203(d).  An individual employed in that capacity "generally meets the duties requirements for the administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance."  *Id.*  At the same time, however, "clerical or secretarial work" such as "recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work," does not require the "exercise of discretion and independent judgment," and therefore falls outside the administrative exemption.  *Id.* § 541.202(e).

The ultimate question of "[w]hether an employee comes within the FLSA administrative employee exemption from overtime benefits is a question of law."  *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 891 (D.C. Cir. 2010).  Nevertheless, if "the underlying facts are in dispute, '[t]he exemption question under the FLSA is a mixed question of law and fact.'"  *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) (alteration in original) (quoting *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012)).  "Whether a particular duty is administrative presents a legal question, whereas the amount of time devoted to administrative duties, and the significance of those duties, are questions of fact."  *McKinney v. United Stor-All Ctrs. LLC*, 656 F. Supp. 2d 114, 122 (D.D.C. 2009); *see Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) (explaining that how employees spending their time

working "is a question of fact").  If the record discloses a genuine dispute regarding the

employee's primary duty or her exercise of discretion, that dispute is a question of fact for the

jury to resolve.  *See Radtke*, 795 F.3d at 165 (affirming the denial of a motion for judgment as a

matter of law where "the parties introduced conflicting evidence regarding the appellees'

primary duties"); *see also Ruggeri*, 585 F. Supp. 2d at 274 (declining to grant summary judgment

where, among other things, "there is substantial dispute about how to characterize the level at

which [the employee's] discretion was exercised").

In this case, the Fund contends that Ms. Benton's job responsibilities involved non-

menial tasks that are directly related to the Fund's management or general business operations,

including, among other things, preparing and filing proposals for federal, local, and union grant

funding, soliciting contract bids from service providers and vendors, scheduling training for

signatory contractors and preparing the Fund's training schedule, and regularly communicating

with Carday, the Fund's third-party administrator.  *See, e.g.*, Def.'s Mem. Supp. Mot. Summ. J.

at 17.  The Fund further argues that Ms. Benton exercised a level of discretion and independent

judgment with respect to these tasks.  *See, e.g.*, *id.* at 18–21.  For her part, Ms. Benton claims

that her primary duties entailed merely supporting the Fund's director, and that she lacked the

discretion to make decisions without the authorization of the director.  *See, e.g.*, Pl.'s Mem.

Supp. Mot. Summ. J. at 11–15.  Both parties argue that the material facts sufficient to make these

determinations are undisputed and, therefore, that summary judgment should be granted in

their favor.

Nevertheless, the Court concludes that the record contains genuine disputes of material

fact that preclude granting summary judgment for either party.  First, there is a dispute in the

record concerning the nature of the tasks that Ms. Benton performed.  That dispute prevents the

Court from concluding that the record can only support a finding that those tasks either did or did not relate to "the management or general business operations of the employer." The Fund claims that Ms. Benton's work "far exceeded a traditional 'administrative assistant,'" and "involved carrying out the Fund's policies and procedures." Def.'s Mem. Supp. Summ. J. at 18. By contrast, Ms. Benton characterizes her role as more akin to the plaintiff in *Rainey v. America Forest & Paper Ass'n*, in which a court in this district concluded that an employee was not exempt because her job duties involved, among other things, "assisting the senior director in creating reports, spreadsheets, and special projects, including with regard to work with outside consultants and for preparation for audits and investigations," but "did not require plaintiff to do anything but carry out the instructions of her supervisor." 26 F. Supp. 2d 82, 89 (D.D.C. 1998). Yet, in most instances, both of the parties point only to vague descriptions of what Ms. Benton's job duties entailed—descriptions that fail to indisputably show whether those duties involved truly "management" tasks as opposed "menial ones" and, moreover, whether they were Ms. Benton's primary tasks.[7]

---

[7] This latter issue—determining the relative importance of the putative management duties—is important because determining whether duties are among an individual's primary duties involves comparing "the importance of the plaintiff's [exempt] duties with the importance of her [non-exempt] duties, keeping in mind the end goal of achieving the overall success of the company." *McKinney*, 656 F. Supp. 2d at 123 (quoting *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 505 (6th Cir. 2007)); *see also id.* at 123 n.2 (explaining that, "[a]lthough *Thomas* concerned the application of the 'executive' exemption rather than the 'administrative' exemption, both exemptions share the same definition of 'primary duty'"). So far as the parties identify, the record here contains little to no discussion concerning the relative amount of time Ms. Benton spent on those tasks that the Fund claims were related to the Fund's management or general business operations. This is particularly problematic with respect to the Fund's efforts to show that Ms. Benton solicited bids from service providers and executed agreements on behalf of the Fund, because the Fund identifies only three specific instances in which Ms. Benton signed a contract for services on behalf of the Fund, and only one which indisputably falls within the 2011 to 2012 time period. *See* Def.'s Ex. 13, ECF No. 31-15 (GE contract for a copier, signed on July 1, 2009); Def.'s Ex. 14, ECF No. 31-16 (undated equipment contract); Def.'s Ex. 15, ECF No. 31-17 (Pitney Bowes contract for mail services, signed on October 25, 2012).

A representative example is Ms. Benton's work preparing the Fund's applications for grants.  The Fund contends that Ms. Benton "evaluated, completed and submitted the Fund's grant applications."  Def.'s SOF ¶ 25; *see also* Def.'s Opp'n at 13.  In the course of that work, the Fund claims, Ms. Benton "conducted cost assessments, estimated the amount of time needed for training, determined the topics that would be covered in training, estimated the number of trainees to expect, and estimated the costs associated with training and feeding the trainees."  Def.'s SOF ¶ 26.  But the portions of Ms. Benton's deposition that the Fund cites merely indicates that these types of information were included in the Fund's grant applications.  *See* Benton Dep. at 52:8–55:13.  She testified that the director would have her "start to do the grant work," that, "[u]sually the grant proposal was a one page proposal," and that she "always worked with the directors" on the proposals.  *Id.* at 33:1, 53:9–11, 54:14–21.  In her opposition, Ms. Benton claims that her testimony merely indicates that "she assisted the Director in completing the grant form," and that she "never evaluated or approved any grant work."  Pl.'s Opp'n at 3 ¶¶ 6–7.  Moreover, it is not apparent from this evidence whether Ms. Benton's work involved making more substantive or predictive judgments concerning the Fund's needs and describing the Fund's potential use of the funds or, instead, something more akin to the clerical work of simply filling out the grant proposal forms, with direction from the Fund's director and using prior samples as "go-bys."  In the latter case, Ms. Benton's work would be closer to the type of work in *Rainey* the court concluded was not covered by the administrative exemption.  *See* 26 F. Supp. 2d at 89.  These questions of fact must be resolved in order to determine whether Ms. Benton's work was "directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.201(a).

The same type of dispute is apparent with respect to the evidence concerning Ms. Benton's work fielding inquiries from signatory contractors (*i.e.*, those contractors whose collective bargaining agreements required them to contribute to the Fund's work, *see* Benton Dep. at 131:7–19) and communicating with the Fund's third-party administrator, Carday. *See* Def.'s Opp'n at 14. The Fund characterizes Ms. Benton's testimony as establishing that she was the "point person" for the contractors and "would regularly conduct business with them on behalf of the fund." Def.'s SOF ¶ 43. Ms. Benton agreed that she sometimes "interface[d] with the signatory contractors," but testified that she "couldn't give a yes or no answer to a contractor," and would "just gather the information and forward it to the director." Benton Dep. at 132:14–133:6. With respect to Carday, which "physically cut the checks to be paid for vendors," handled payroll and employee benefits, and generally took care of "the administrative side of the [F]und," Meighan Dep. at 31:5–17, the Fund argues that the record shows that Ms. Benton "regularly communicated with Carday regarding matters of high significance," Def.'s SOF ¶ 38. Others, including the Fund's chairman, testified, however, that Ms. Benton did not have the authority to sign checks. *See* Meighan Dep. at 32:16–19; Aff. Kelly Lapping ¶ 4 ("Lapping Aff."), ECF No. 32-9.[8] If Ms. Benton acted more akin to a receptionist in simply responding to inquiries or managing documents that were sent to and from the third-party administrator, her work likely falls more on the side of "the day-to-day carrying out of the business' affairs," and would not constitute work directly related to management or general business operations. *Bothell*, 299 F.3d at 1125.

---

[8] The Court recognizes that the Fund claims Mr. Lapping's affidavit should not be considered because he left his position as director in 2006—long before the 2011 through 2012 time period at issue in this case. *See* Def.'s Opp'n at 11. To be sure, Mr. Lapping's testimony does not bear directly on Ms. Benton's job duties during the 2011 through 2012 time period, but a finder of fact could consider it as corroborating Ms. Benton's testimony to the extent Ms. Benton claims—as she does in several respects—that her duties remained consistent both during and after Mr. Lapping's tenure as director.

Perhaps in an effort to show that Ms. Benton's duties involved "budgeting," "purchasing," or "procurement," 29 C.F.R. § 541.201(b), the Fund also maintains that Ms. Benton had significant financial responsibilities, pointing to the fact that she managed the Fund's petty cash account, issued stipend checks, and had a Fund credit card, *see* Def.'s Opp'n at 14–15. Yet, some of the evidence is disputed or contradictory in this regard. As just noted, Ms. Benton emphasizes that she was unable to sign checks on the Fund's behalf, *see* Meighan Dep. at 32:16–19, and she contends that she was not authorized to commit the Fund's financial resources, *see* Pl.'s Opp'n at 9. Even if she *issued* stipend checks, it is not apparent that Ms. Benton had the authority to approve the amount of those checks or to sign the checks. Ms. Benton did have a Fund credit card, but she discussed using that card only for gas purchases when she traveled to or from the Virginia training site. *See* Benton Dep. at 112:15–19, 113:11–115:7, 265:13–21. Although her testimony indicates that she had some freedom to use the credit card for this purpose, her testimony does not appear to support the Fund's broad proposition that she enjoyed "the discretion to use it when and how she wanted." Def.'s SOF ¶ 50. And with respect to the petty cash account, Ms. Benton testified that the Fund "didn't really purchase anything with the petty cash account," Benton Dep. at 112:11–12, which casts doubt on the Fund's use of this evidence to show that Ms. Benton's primary duties were related to management and business operations.

The Fund also references the testimony of several former Fund directors who assert that Ms. Benton was known to be "in charge" when the directors were away from the office. *See* Decl. of Rodney Sewell ¶ 7, ECF No. 31-10 (Sewell Decl.); *see also* Jones Decl. ¶ 4, ECF No. 31-11. But "the mere fact that an employee [is] 'in charge' does not necessarily mean that her primary duty involved the exercise of management-related responsibilities." *McKinney*, 656 F.

Supp. 2d at 124 (quoting *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 503 (6th Cir.

2007)).  Without a more concrete understanding of what her job duties entailed, the Court cannot

determine whether these tasks fall within the administrative exemption.

It is the third showing required to bring an employee within the administrative exemption

that is most critical to the Court's conclusion that there exist genuine issues of fact, however.

The parties present particularly divergent evidence concerning whether Ms. Benton was able to

exercise independent discretion.  Even if the Fund could show that Ms. Benton's job duties

primarily involved management or general business operations, the record discloses a dispute

regarding the latitude she was given to make those decisions.  *See Ruggeri*, 585 F. Supp. 2d at

275 (noting that plaintiffs "would not be exempt if the *performance* of their work was significant

to Defendant, but the matters over which they had *discretion* were not" (emphasis in original)).

The Court finds that a genuine issue of fact exists concerning this third prong of the

administrative exemption test.

As noted above, an employee must exercise "discretion and independent judgment with

respect to matters of significance" to be exempt.  29 C.F.R. § 541.202(a).  Such discretion arises

if the employee is tasked with "the comparison and the evaluation of possible courses of conduct,

and acting or making a decision after the various possibilities have been considered."  *Id.*  But

the mere fact that "an employee's decision may be subject to review and that upon occasion the

decisions are revised or reversed after review does not mean that the employee is not exercising

discretion and independent judgment."  *Id.* § 541.202(c); *accord Piscione v. Ernst & Young,*

*LLP*, 171 F.3d 527, 535–36 (7th Cir. 1999) ("Even though [Plaintiffs'] work is subject to

approval, even to the extent that a decision may be reversed by higher level management, it does

not follow that the work did not require the exercise of discretion and independent judgment as

the terms are defined for the administrative employee exemption." (quoting *Dymond v. U.S.*

*Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982))), *overruled on other grounds by Hill v.*

*Tangherlini*, 724 F.3d 965 (7th Cir. 2013).  In the Court's view, the difference boils down to a

distinction between employees who must affirmatively obtain authorization to do something, and

employees who enjoy the ability to make independent decisions in their own discretion, even if

those decisions are subject to later revision by superiors.  *Compare, e.g.*, *Moncrief v. Daro*

*Realty, Inc.*, No. 03-762, 2005 WL 1119794, at *6 (D.D.C. Apr. 28, 2005) (concluding that

plaintiffs exercised discretion and independent judgment where they "supervised other

employees, assigned and directed the work of other employees and contractors, ordered supplies,

handled employee issues, made day-to-day decisions, handled tenant complaints and leased

apartments"), *with McKinney*, 656 F. Supp. 2d at 129 (denying employer's motion for summary

judgment where employer's operations manual "greatly limited the discretion and independent

judgment exercised by Primary Managers, both by prescribing detailed procedures for the

completion of nearly all day-to-day tasks and by requiring that Primary Managers defer to

District Managers on most matters of significance to the business").

And, here, the factual evidence provides two different understandings of Ms. Benton's

authority—evidence that must be weighed by the jury.  For example, the Fund contends that Ms.

Benton "executed agreements with service providers on behalf of the Fund for tens of thousands

of dollars," that Ms. Benton "made discretionary financial decisions," and that she also "made

the training schedules and, as a result, managed the training instructor's [sic] work schedules."

Def.'s Mem. Supp. Mot. Summ. J. at 19–20.  Some of these characterizations of Ms. Benton's

discretion come from the testimony of her co-workers, the Fund's chairman, or the declaration of

a former director who simply asserts, without elaboration, that that Ms. Benton "set up training

schedules," "select[ed] service providers," and "authorize[d] certain Fund expenditures."  Sewell Decl. ¶ 4; *see, e.g.*, Def.'s SOF ¶¶ 30–32, 53.

Yet, Ms. Benton's own testimony paints a more limited picture.  It is true that her signature appears on the three equipment rental forms that the Fund identifies.  *See* Def.'s Ex. 13, ECF No. 31-15 (GE contract for a copier); Def.'s Ex. 14, ECF No. 31-16 (unidentified equipment contract); Def.'s Ex. 15, ECF No. 31-17 (Pitney Bowes contract for mail services).  Ms. Benton testified, however, that, she "took instructions from the director" when soliciting bids for services, that "no decisions" concerning equipment leases "were made without [the director's] authorization," and that she only signed the copier lease, specifically, because the director could not be in the office that day.  Benton Dep. at 128:5–8, 138:7–8, 147:15–16.  In addition, she claims that she lacked any authority to independently make training schedules.  "Any schedule that I've put together was approved by the director," she testified.  *Id.* at 111:9–10.  Finally, as already discussed above, the record does not appear to necessarily support the Fund's broad assertion that Ms. Benton was empowered to make significant financial decisions.

Admittedly, this contrary evidence comes almost exclusively from Ms. Benton's own testimony.  A plaintiff's own, even self-serving testimony, however, will often suffice to defeat summary judgment—particularly where she has firsthand knowledge of a fact or observed an event, and where the case depends on the jury's resolution of competing testimony and witness credibility.  *See Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).   "To the extent the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly."  *Id.*; *see also Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008).  Here, a reasonable jury could find Ms. Benton credible and credit her testimony that she lacked the ability to make independent

determinations concerning equipment rentals and leases, training schedules, or financial decisions.  If the jury did so, it would likely have to conclude that she lacked the "exercise of discretion and independent judgment" necessary to make her exempt under the FLSA.

And even some of Ms. Benton's co-workers and the Fund chairman, upon whose testimony the Fund largely relies, were more tentative in their assessment of Ms. Benton's discretion.  For example, Mr. Mejia, an instructor supervisor, testified during his deposition that "it would be the director" who determined locations for trainings, but that Ms. Benton "would work with him to determine the location which will be more convenient for inspectors."  Mejia Dep. at 27:17–28:1, ECF No. 31-7.  Mr. Mejia stated that Ms. Benton could "make [a] suggestion to the director," but that "[s]uggestions can be made by anyone."  *Id.* at 28:18–29:1. Similarly, the Fund's chairman, Mr. Meighan, also hedged his testimony regarding Ms. Benton's ability to enter into contracts with service providers, stating that his understanding was that Ms. Benton did enter into the contracts, "and there was no recourse by the director," so he "would assume she had the implied authority."  Meighan Dep. at 82:7–9.  But it is equally plausible that there was no recourse because, as Ms. Benton testified "no decisions were made without [the director's] authorization."  Benton Dep. at 147:15–16.

To be sure, as the Fund emphasizes, the Department of Labor's regulations make clear that an "executive assistant or administrative assistant" can meet the requirements for the administrative exemption "if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance."  29 C.F.R § 541.203(d).  And the Fund cites several cases in which courts have determined that these criteria were met.  *See* Def.'s Mem. Supp. Mot. Summ. J. at 15 n.8.  At bottom, however, much of the evidence the parties present in *this* case is framed in very generalized terms, leaving the

Court unable to meaningfully determine whether Ms. Benton's role meets these criteria. Questions of fact remain, for example, concerning whether the preparation of grant proposals involved work directly related to the Fund's management or more routine, menial paperwork—and, even if so, whether those duties were Ms. Benton's primary ones. In addition, there remains the question of whether Ms. Benton was "delegated authority regarding matters of significance" without "specific instructions or prescribed procedures." 29 C.F.R. § 541.203(d). Thus, there exist genuine issues of material fact, and the Court must deny both parties' motions for summary judgment. *See Gonda v. Donahoe*, 79 F. Supp. 3d 284, 306 (D.D.C. 2015) (denying summary judgment where "there is a genuine dispute of material fact as to whether the administrative exemption applied").

\*       \*       \*

Given the existence of genuine issues of fact, resolution of the remaining issues the parties raise in their respective motions for summary judgment is premature. The Fund urges the Court to decline to exercise supplemental jurisdiction over Ms. Benton's DCMWRA claim or otherwise grant summary judgment in the Fund's favor because the DCMWRA also exempts employees employed in a bona fide administrative capacity—an exemption that D.C. courts construe identically to the FLSA's exemption. *See* Def.'s Mem. Supp. Summ. J. at 21–22; *see also* D.C. Code § 32-1004(a)(1) (exempting an employee "employed in a bona fide executive, administrative, or professional capacity . . . as these terms are defined by the Secretary of Labor under 201 *et seq.* of the Fair Labor Standards Act"). But the latter issue overlaps with the FLSA exemption issue, the resolution of which depends on disputed issues of fact. Until the Court definitively resolves the coverage issue, there are grounds for exercising supplemental jurisdiction over the D.C. law claim raising common questions of law and fact.

For her part, Ms. Benton argues that she is entitled to liquidated damages and that she has met her burden to show the number of overtime hours worked. *See* Pl.'s Mem. Supp. Summ. J. at 15–18; Pl.'s Reply at 9–12, ECF No. 36. The FLSA provides for liquidated damages; an employer can be liable to the employee "in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). An employer can avoid such damages by showing "to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." *Id.* § 260. "In most instances an employer will be able to satisfy § 260's 'reasonable grounds' requirement only if it has relied on a reasonable, albeit erroneous, interpretation of the Fair Labor Standards Act or of the regulations issued thereunder." *Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C. Cir. 1994). Until the Court resolves exactly what Ms. Benton's job duties entailed, however, the Court cannot adequately assess whether liquidated damages are warranted in this case. *See id.* at 373 ("A court cannot evaluate the 'reasonableness' of an employer's belief that its 'act or omission was not a violation' without first identifying the 'act or omission.'"). And, finally, until liability is established, any damages determination is premature.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 31) is **DENIED** and Plaintiff's motion for summary judgment (ECF No. 32) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 27, 2016                               RUDOLPH CONTRERAS
                                                                              United States District Judge